Filed 4/23/25

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

MAO HIN,

Defendant and Appellant.

S141519

San Joaquin County Superior Court

SF090168B

---

## ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING

THE COURT:

The majority opinion in this matter, filed on February 3, 2025, and appearing at 17 Cal.5th 401, is modified as follows:

1.  The fifth sentence of the third full paragraph on page 421 is modified to read:

Police recovered a shell casing from the middle of the street in front of the carport.

2.  The third sentence in the carryover paragraph on pages 425 to 426 is modified to read:

A shell casing recovered from the scene matched the nine-millimeter used in the American Legion Park and Bedlow Drive shootings.

3. The fifth sentence of the first full paragraph on page 426 is modified to read:

Shell casings collected from the scene were fired by the same Beretta used in the American Legion Park and Bedlow Drive shootings.

4. The first sentence of the second full paragraph on page 456 is modified to read:

The evidence was sufficient to establish that, following a confrontation, Hin drove Kak and Chun to a residence in a rival gang's territory, slowed down to allow Kak to shoot, then made a U-turn to drive past the residence again so Kak could continue to shoot.

This modification does not affect the judgment. Defendant's petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MAO HIN,
Defendant and Appellant.

S141519

San Joaquin County Superior Court
SF090168B

February 3, 2025

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

Opinion of the Court by Liu, J.


Defendant Mao Hin was sentenced to death in 2005 for the murder of Alfonso Martinez during the commission of a robbery and kidnapping, and while participating in, and for the benefit of, a criminal street gang (count 1). (Pen. Code, §§ 187, subd. (a), 189, 190.2, subd. (a)(17)(A), (B), (22); all undesignated statutory references are to the Penal Code.) The jury also convicted Hin of the willful, deliberate, and premeditated attempted murder of Deborah Pizano during the same incident (count 3) (§§ 664, 187, subd. (a)) and for the second degree robbery of both Martinez and Pizano (counts 2 and 4) (§ 211), and it found true allegations that a principal personally and intentionally discharged a firearm leading to death or great bodily injury during the commission of those crimes (§ 12022.53, subds. (d), (e)). The jury found not true that the murder, attempted murder, and robberies were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)

In addition, the jury convicted Hin of five counts of willful, deliberate, and premeditated attempted murder (counts 5 through 9) (§§ 664, subd. (a), 187, subd. (a)) for a separate incident involving a drive-by shooting, and it found true allegations that a principal personally and intentionally discharged a firearm causing great bodily injury during each of the attempted murders (§ 12022.53, subds. (d), (e)). The jury also convicted Hin of two counts of shooting at an inhabited dwelling (counts 10 and 12) (§ 246), and one count of shooting at

an occupied vehicle (count 13) (§ 246) during that same incident. The jury found true allegations that each of these crimes was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) Finally, the jury found Hin guilty of one count of being an active participant in a criminal street gang during the commission of the drive-by shooting (count 15). (§ 186.22, subd. (a).) This appeal is automatic. (§ 1239, subd. (b).)

For the reasons below, we reverse the six counts of attempted premeditated murder and the one count of being an active participant in a criminal street gang. We further vacate the gang-murder special-circumstance true finding. We affirm the judgment in all other respects.

## I. FACTS

### A. Guilt Phase Evidence

The charges against Hin concerned two separate events: a murder and robbery in American Legion Park on October 10, 2003, and a drive-by shooting on Bedlow Drive on November 8, 2003. Both sets of charges included gang enhancements. In order to establish a predicate for those enhancements and to provide context and motive for the charged crimes, the prosecution introduced evidence of a third shooting on Hammer Lane that occurred one month before the first of the charged crimes.

#### 1. Uncharged Shooting on Hammer Lane

On the evening of September 12, 2003, shots were fired from a blue Honda Accord into a Mitsubishi at the intersection of Lan Ark Drive and Hammer Lane in Stockton. There were three passengers in the Mitsubishi: one was killed; the second, the driver, was shot in the face; and the third was shot in her spine and paralyzed for three months before she regained the

2

ability to walk, albeit with a limp. The victims testified that the car was sometimes used by the passenger's brother, whom police said was a member of the Asian Boyz Gang (ABZ). The driver of the Mitsubishi identified the shooter as Rathana Chan, also known as "T-Bird." Among other evidence, detectives recovered a .22-caliber shell casing in the gutter just west of the intersection. Police did not find any weapons in the victims' car or any indicia of gang involvement.

Two days later, police discovered a blue Honda Accord in the parking lot of Chan's apartment that was later identified by one of the victims of the Hammer Lane shooting. A search of that vehicle revealed latent fingerprints later matched to Chan and codefendant Rattanak Kak. None of the prints matched Hin, but Hin later admitted in a statement to police that he was in the Honda Accord that evening. The prosecutor's theory was that Hin, Chan, and Kak, all members of the Tiny Rascals Gang (TRG), fired on the Mitsubishi believing it to be driven by a member of their rival gang, ABZ.

Although Hin and Kak were originally charged with this offense, all charges were later dropped. Police obtained an arrest warrant for Chan but were unable to locate him by the time of trial. The facts of the Hammer Lane shooting were offered at the guilt phase of the present case solely as a predicate offense for the gang allegations relating to the charged crimes.

### 2. Murder and Robbery at American Legion Park

Around 9:30 p.m. on October 10, 2003, Debra Pizano and Alfonso Martinez were walking together in American Legion Park when they saw two individuals coming toward them. One individual, later identified as Kak, pulled a gun, and pointed it toward their heads. The second individual, later identified as

3

Hin, said, "All right. All right. All right. Give me all your money." The couple gave their money and Pizano's purse to Hin, who then instructed the couple to go farther into the park where it was darker. One of the individuals shoved Martinez. When they reached the bottom of the hill, Hin and Kak took Martinez's clothes and Pizano's watch. Hin and Kak started to walk away, then Hin made a comment about how it was dangerous to walk in the park late at night. Both Hin and Kak started laughing. Then Pizano heard four gunshots. Martinez fell down, and Pizano heard him trying to breathe. Pizano felt blood on her head.

Paramedics declared Martinez dead at the scene. The autopsy revealed two gunshot wounds, one entering Martinez's left upper back and one entering the front of his left thigh. Pizano was shot in the head and leg but survived.

At the hospital shortly after the shooting, Pizano told officers that only one of the two individuals had a gun, and that the same individual had the gun throughout the incident while the other one spoke. Pizano was not able to identify either Hin or Kak in a photographic lineup and maintained that both suspects were Black and between 5 feet10 inches and 5 feet 11 inches tall. Hin is Cambodian; at the time of his arrest, he was 5 feet 7 inches tall, 145 pounds, with black hair, brown eyes, and a medium skin tone. A few days before she testified, Pizano met with the prosecutor and for the first time stated that a photograph of Hin looked similar to the "guy that was talking" on the night in the park.

### 3. Drive-by Shooting on Bedlow Drive

On the evening of November 8, 2003, approximately 13 people were gathered in a residential carport on Bedlow Drive,

4

drinking beer and listening to music. The carport encompassed three adjoining residences. One witness in the carport reported that a car approached slowly and then one or more occupants opened fire. Witnesses reported hearing 16 or more shots in one or two sets. One witness thought all of the shots came from a single gun, though "[i]t could be two," while another testified that the shots may have been fired from two different guns. One witness described 20 to 30 shots from three different guns. Two witnesses observed what they thought was a grey van driving away after the shooting stopped; another described a van that was "maybe white, blue, brown."

Police observed gunshot damage and bullet holes to the structure within two of the attached residences, both of which were occupied at the time of the shooting. A bullet hole was also found in the rear bumper of one of the cars parked in the carport. Three individuals in the carport (Ream Voeuth, Nath Sok, and Krisna Khan) and two in the adjoining residences (Sobin Pen and Sokhon Hing) sustained gunshot wounds, and Hin and Kak were charged with the attempted murder of each victim.

Two officers responding to the scene were flagged down by someone in a blue van with shattered glass and a bullet hole driving away from the scene. There were three or four individuals in the van, one of whom was injured and transported to the hospital. All the damage appeared to have been caused by shots entering (rather than exiting) the van. Police recovered several spent bullets inside the van but did not find any weapons on these individuals or in the van. Police also recovered shell casings from the middle of the street in front of the carport. No bullet holes were found on the opposite side of the street, and officers did not locate any weapons at the scene.

Later that night, officers located a tan Toyota van approximately one mile away from the scene that matched the suspect description. The officer recognized the van as one he had seen Hin driving in the past and confirmed via DMV records that it was registered to Hin. The police set up surveillance, and shortly after midnight, officers observed three individuals get into the van and start driving. One of the officers recognized Hin from prior contacts and knew he did not have a valid California driver's license; they conducted a vehicle stop on that basis. Hin was driving, with Kak in the front seat and Sarun Chun in the back middle seat. At the time of their arrest, Kak and Chun were both 16 years old and Hin was 19 years old. Officers observed that Hin appeared to have been drinking. Behind the driver's seat, officers found two 9-millimeter shell casings, consistent with a passenger shooting out of the passenger side window. The shell casings were partially covered by trash.

### 4. Hin's Statement

Officers arrested Hin after the traffic stop the night of the Bedlow Drive shooting. Hin denied doing anything wrong and said he had not fired a gun since he was 15 years old. Officers later brought Kak into Hin's interview room; Kak told Hin that he had already confessed to the shooting. Hin then told officers that he, Kak, and Chun were confronted by a group of men at a gas station that evening and that Hin followed that group to Bedlow Drive where he heard gunshots, at which point Kak started shooting. Hin claimed he did not know Kak had a gun until Kak started shooting. In a subsequent interview, Hin claimed that rival gang members followed him from the gas

station and then fired at his car. At that time, he also denied that Chun was in the car.

During the course of a second, videotaped interview, officers questioned Hin about the shootings at American Legion Park and on Hammer Lane. Hin admitted he was at the park and participated in the robbery with Kak because they "needed money," but he denied that he was the shooter. Hin explained that he and Kak had been gambling that evening, and Hin had lost $10 or $20. According to Hin, he was not present when the shots were fired. Instead, Hin said he ran up the hill after the robbery, then heard a shot and threw away most of the stolen items. Hin initially denied knowing anything about the Hammer Lane shooting, but eventually admitted he was sitting in the front passenger seat of the car when two people in the car began shooting. According to Hin, he was not a member of the TRG then, but the others in the car were trying to recruit him.

### 5. *Firearm Evidence*

Police obtained search warrants for several locations connected to this investigation. At Hin's residence, police found a .12-gauge shotgun shell and a box of .22-caliber ammunition (among other items, including photographs and writings indicative of gang affiliation). At Kak's residence, police found .44-caliber and .22-caliber ammunition. And at the residence and in the vehicle of Sokha Bun, officers recovered a nine-millimeter Beretta, a loaded .44-caliber Redhawk revolver, and .22-caliber ammunition. Searches of the two other residences revealed gang-related paraphernalia.

A firearms expert opined that three firearms were involved in the shooting at Hammer Lane, including a .44-caliber revolver, a .22-caliber firearm, and either a .357 or .38-

caliber firearm. The expert testified that the bullet recovered from the driver was "consistent" with test fires from the .44-caliber revolver seized from Bun's residence, but "there was insufficient detail for an identification."

Turning to the American Legion Park shooting, the expert testified that the nine-millimeter shell casing found near Martinez's body was fired from the Beretta seized from Bun's residence. But the expert added it was possible that a bullet fragment recovered from Martinez's body could have come from a second gun, possibly a revolver.

Finally, the firearm expert matched one of the bullets recovered from Bedlow Drive, a shell casing recovered from the street, and the copper jackets found in Hin's van to the Beretta. The expert further testified that the .44-caliber ammunition found at Kak's residence matched the loaded rounds inside the .44-caliber revolver found at Bun's residence. Bun told detectives that Hin gave the guns to him at a party on the evening of the Bedlow Drive shooting, asking Bun to hold the weapons as Hin and Kak had "done some things." Both the Beretta and the revolver had been stolen from their previous owners.

### 6. Gang Evidence

Detective Kathryn Nance from the Stockton Police Department testified as an expert on criminal street gangs, opining that Hin and Kak were members of TRG. According to Detective Nance, TRG is aligned with various Blood gangs and is an enemy of "all of the Crip gangs," including ABZ. She said that although TRG does not associate with African American Blood gangs, members of TRG emulate them "in the manner of dress and the speech and the bandannas, the clothing that's

worn" as well as "with the music, rap music."

Detective Nance testified that TRG's primary activities include vehicle thefts, shootings of people and inhabited dwellings, murder, assaults, and burglaries. She testified that TRG's pattern of criminal conduct included a conviction of TRG member Rathana Chan for sale of a controlled substance in 2001, a sustained juvenile petition for TRG member Sophear Om for burglary in 2002, the shooting at Hammer Lane, and the charged offenses at American Legion Park and Bedlow Drive.

Detective Nance offered her opinion that Hin had been a documented member of the TRG street gang since June 26, 2003, and was an active member at the time of his arrest on November 9, 2003. The prosecution asked Detective Nance about the gang significance of several pieces of evidence that were recovered from a search at Hin's residence. This evidence included several photographs of Hin with other TRG members making hand signs and wearing gray, black, and red clothing. The evidence also included several "homemade-type" CDs that were found in Hin's and Chun's bedrooms and had "similar" songs on them. Detective Nance opined that the writing on the CDs had gang significance.

The prosecution then played one song labeled "Bang, Bang" from the CD found in Chun's room. Detective Nance opined that the song's reference to being a "straight-up apple murderer" referred to "shooting, to killing, to eliminating the enemy, which would, in that case, be ABZ." She further opined that the song's use of the word "n[***]a" was evidence of Southeast Asian gangs "mimicking the African American slang." The song, she testified, was used "for more than just listening enjoyment"; the song's lyrics are "like a guidebook for the gang

members' rights, rules they live by and ways they carry out and commit their crimes."

Detective Nance further opined that the robbery and murder of Martinez at American Legion Park were gang related and committed to promote the TRG gang based on several theories. Her opinion was based on the fact that two members of the same gang were together, they were motivated to recover their gambling losses because a gang needs money to survive, and the gun used was "a TRG gun." She also opined that it had been committed to promote the TRG gang as a form of "training" whereby older members of the gang show younger members how to commit crime. She also opined that the shooting at Bedlow Drive was gang related and committed for the benefit of the gang, based on her belief that the shooting occurred in the territory of a rival gang and was "a showing of power over the other gang." In her opinion, the shooting at Hammer Lane was also gang related based on the fact that four members of the TRG were "in an area that's not typically where they would be," and their victims were in a car associated with a "very well-known" member of the rival ABZ gang.

Finally, Detective Nance opined that Hin was the leader in the charged incidents involving Kak and Chun. She based this opinion in part on the fact that Hin was driving the vehicle for the shooting and that he appeared to be "in charge of the guns," crediting as true Bun's statements that Hin gave the guns to him after the shooting.

### 7. *Defense Evidence*

Codefendant Kak introduced testimony from an investigator that the light in the park was sufficient to observe the race, gender, and clothing of the individuals in the park,

though he acknowledged he had "no idea" what the lighting conditions were on the day of the crimes.

Hin called his own gang expert, Professor Martin Sanchez Jankowski. Professor Jankowski opined that the shooting at American Legion Park was not gang-related or committed for the benefit of the gang, noting that there was no evidence that any of the money secured went back to the gang. Instead, he believed the evidence showed that the shooting was "an individual act." Professor Jankowski did not disagree with Detective Nance's opinion that Hin was a gang member, and he agreed that a 19 year old would be a leader over a 16 year old. He did not review information regarding the drive-by shooting at Bedlow Drive.

Hin also called his brother, Bo Hin. Bo testified that he owned the two guns he showed to officers the day they searched Hin's residence, explaining that both guns were in his car because he had just returned from a hunting trip. Bo further testified that the .22-caliber ammunition found in the house belonged to him and that he would use it to shoot his friend's gun.

## B. Penalty Phase Evidence

### 1. Case in Aggravation

At the penalty phase, the prosecutor relied on the evidence introduced at the guilt phase, including playing the song "Bang, Bang" again for the jury and introducing evidence of the uncharged criminal activity comprising the Hammer Lane shooting. The prosecutor also introduced evidence of three more instances of uncharged criminal activity by Hin:

In May 2003, Hin was part of a group that confronted the manager of the Manchester Arms apartment building, hitting

him in the face with a beer after the manager asked the group why they hung around near the apartment gate and scared people. The prosecution's gang expert opined that this attack could be considered gang related and would help establish Hin's membership in the TRG gang.

In October 2003, shots were fired from a van at a residence on Comstock Drive. A witness told police the shots were fired from a tan minivan and testified that a van identified as Hin's could have been the one used in the shooting. Shell casings collected from the scene were fired by the same Beretta used in the American Legion Park and Bedlow Drive shootings. The prosecution's gang expert testified that the location was primarily a Blood neighborhood, but that a member of a gang that was a rival to the TRG lived next door to the shooting.

Also in October 2003, a group dressed in colors consistent with the TRG gang attempted to force their way into a van near the Manchester Arms apartment building yelling about the "OCG," referring to the Original Crip Gang. After the van was parked, one of the passengers walked then heard 10 shots, five of which hit the van. Another one of the passengers identified Hin as the shooter in a photographic line-up and explained that he thought the group shot at the van because his brother was a member of a rival gang. At trial, the passenger was "not really sure" about the identification but later explained that he was afraid of testifying and stated he was positive that Hin hit the car window, pulled a gun, and fired it. A shell casing recovered from the scene matched the nine-millimeter used in the American Legion Park and Bedlow Drive shootings. The prosecution's gang expert testified that TRG and OCG are

enemies and that it would be considered disrespectful for a OCG member to drive into TRG territory.

The prosecutor also offered victim impact evidence. Pizano testified that she still had scars from the shooting in American Legion Park, that it was difficult to see Martinez's casket and attend his funeral, and that she had to defer plans to attend college and take time off work as a result of her emotional trauma. Martinez's mother, father, siblings, and best friend all testified about his life and the pain his death had caused.

### 2. Case in Mitigation

In mitigation, Hin called one of the officers who investigated the incident at the Manchester Arms apartments. The officer testified that the victim mentioned Hin's name but did not tell him that Hin was the individual who struck him in the face or threw the beer bottle.

A school district outreach worker testified that she knew Hin as a friendly, quiet, and respectful student. Her last contact with Hin was in 1998 when he was in eighth grade. A reading specialist at the school who knew Hin when he was in fourth through sixth grades described him as a happy, easygoing student who did not have any behavioral problems.

Hin's brother testified that Hin worked in a warehouse for the year prior to his arrest, giving most of his income to his disabled parents. His brother further testified that he had not seen anything to indicate that Hin was involved in gangs.

Hin's sister explained that the family moved to the United States from the Philippines in 1985, when Hin was a baby. While they were still in the Philippines, Hin got sick and his eyes rolled back in his head and his fingers started to "crunch,"

possibly indicating a seizure. Around the age of five, Hin had another severe seizure. Hin did not graduate from high school, though his siblings did. His sister testified that Hin helped a lot in taking care of their father and that he had given money to the family. When Hin was 16 years old, he stayed with his sister for three months. He brought a gun to their home, which his sister took away and gave to an officer. She did not believe Hin was involved with gangs. She noted that Hin was shot at some point and, after that, acted scared and fearful for his life.

Dr. Michael Fraga, a clinical forensic psychologist, provided a social history of Hin's life based on conversations with Hin's mother and father, siblings, and teachers; Hin's academic records; and four separate interviews with Hin. Dr. Fraga testified that Hin's parents and older siblings fled from the turmoil in Cambodia following the Khmer Rouge regime. After several years in refugee camps in Thailand and the Philippines, the family immigrated to the United States. His father never learned to speak English, and his mother spoke only a little.

According to family members, Hin was born with the umbilical cord around his neck, though there is no medical record of whether that affected the level of oxygen to his brain. Dr. Fraga learned about the seizures reported by Hin's sister, but no medical treatment was provided in either instance, and there appeared to have been no subsequent seizures. Hin's grades were average until they abruptly fell off during his sophomore year of high school, and he was suspended from school at various points. Dr. Fraga attributed this change to the decline in Hin's father's health. He noted that younger students referred to Hin as Dumbo and assumed he was part of TRG.

14

Dr. Fraga attributed some of Hin's problems in school to "his ethnicity as a Cambodian." Hin also began drinking at age 12 or 13 and was "an established alcoholic" by the age of 15; he told Dr. Fraga he drank alcohol to cope with stress. Dr. Fraga opined that Hin had the function and intellect of a 14- or 15 year old and therefore lacked the "strength and the direction" to lead. Hin told Dr. Fraga that he was not a gang member, but he admitted to associating with gang members, explaining that it was safer for an Asian on the streets to be part of a group. Hin denied pushing Pizano down the hill at the park but admitted he told her to go down the hill. He told Dr. Frago that Kak went crazy and started shooting. He had nightmares about Martinez and attempted suicide while in custody by taking 20 Tylenol tablets.

Hin addressed the court at sentencing. He denied shooting anyone at American Legion Park or Hammer Lane, adding that he didn't kill anyone on Bedlow Drive and "didn't tell nobody to do nothing." To the Martinez family, Hin stated: "I didn't kill your son. I'm sorry for what's [*sic*] happened. It's very painful, I understand. I might get on my knee and beg please. Don't bring nothing back. But I want you to know something, I wasn't the killer." He explained that his father had recently died, but he could not cry because he had lost all feelings. He concluded: "I want you guys to know I'm very sorry."

## II. PRETRIAL ISSUES

### A. Request for Review of Sealed Psychological Report for Codefendant Saran Chun

Before trial, counsel for then-codefendant Chun declared a doubt as to Chun's competency to assist in his defense, and the

15

trial court appointed two doctors to examine him.  Hin joined a request by Kak's counsel to obtain discovery of the doctors' reports, suggesting they might contain material discoverable under *Brady v. Maryland* (1963) 373 U.S. 83.  Having reviewed the reports, the court denied Hin's request, explaining that there was "nothing exculpatory" in the records and sealing them in the court file for appellate review.

Hin asks that we review those records not disclosed to him by the trial court and assess whether the trial court's rulings were proper, or whether the files include materials that should have been disclosed to Hin as a matter of due process under the state and federal Constitutions.  In particular, Hin contends that the records would provide material information about Chun's mental state at the time of the incidents at issue, as well as the veracity of the prosecution's evidence regarding Chun's participation in both the charged and uncharged offenses in this matter.  Hin argues our review is necessary to protect his federal constitutional rights to meaningful and effective review of his capital murder conviction and death sentence, and to the assistance of counsel in presenting his postconviction claims.

"Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' " (*People v. Price* (1991) 1 Cal.4th 324, 493; see *People v. Landry* (2016) 2 Cal.5th 52, 74 (*Landry*).) Hin's arguments reflect a fundamental misunderstanding of the purpose of an inquiry into a defendant's competency.  The expert reports here were issued to assist the court in evaluating, among other things, "[w]hether the defendant, as a result of a mental

disorder or developmental disability, is able to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1369, subd. (b)(1)(B).) Thus, they pertain to Chun's mental competency *at the time of trial*. Hin's assumption that the report would address Chun's mental state at the time of the commission of the crime is incorrect.

In any event, we have reviewed the record and conclude that the trial court did not abuse its discretion in rejecting disclosure of the materials.

## B. Motion to Suppress Custodial Statements

Hin argues that the trial court committed constitutional error in denying his motion to suppress the custodial statements he made following his arrest. According to Hin, the interrogating officers did not properly advise him of his rights. He further argues that his waiver of rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) was involuntary because it was obtained by threats of punishment, implied assurances of leniency, and false promises of confidentiality. At trial, Hin additionally argued his waiver was not knowing and intelligent because he was intoxicated at the time of his arrest. We reject these arguments.

### 1. *Background*

After the traffic stop that lead to Hin's arrest, Hin was arrested, placed in the rear seat of a patrol car, and advised of his *Miranda* rights. Hin said he understood. The arresting officer told Hin that officers had found some shell casings in the van, and Hin, after asking what kind of casings, said that he did not know anything about them. Hin was then transported to

the police department.  According to the police report, Hin was intoxicated at the time of his traffic stop and arrest.

Approximately one hour later, at 1:30 a.m., the arresting officer contacted Hin in the holding cell, confirmed that Hin remembered his rights, then informed Hin that they had performed a gunshot residue test of his hands and that they wanted to talk to him about the shell casings.  Hin replied that he had not fired a gun since he was 15 years old and that he had not done anything wrong.  A breath test administered around the same time showed a blood-alcohol content of 0.08 percent.

A few hours later, around 4:00 a.m., one of the detectives asked Hin if he remembered his rights.  Hin affirmed, and the detective proceeded to interview Hin regarding his involvement in the shooting on Bedlow Drive.  This first interview concluded shortly before 5:00 a.m.  Hin was transported to the investigations building of the police department around 6:00 a.m., where he was given an opportunity to rest, provided with food, and given access to the restroom.

Hin's second interview began that afternoon around 3:00 p.m., when Hin was again advised of his *Miranda* rights.  Hin answered questions regarding the shooting at Bedlow Drive, and eventually admitted that he and Kak were involved.  The interview was recorded and portions were played for the jury.  During this second interview, the detective came to believe that Hin was involved in the shootings at Hammer Lane and American Legion Park and made arrangements for the relevant investigators to interview him.

Hin's third interview, with a new set of detectives, began around 7:00 p.m., at which time Hin was apparently asleep.  Detective Youn Seraypheap woke Hin up and asked him if he

18

remembered his rights, saying, "You remember reading your rights and all that?" to which Hin responded, "Yeah." The detectives then questioned Hin about the shooting at Bedlow Drive and Hin's gang involvement, then pressed him for details about the killing at American Legion Park. Detective Seraypheap said Hin needed to "come clean" about what happened or else Hin would go to court and "most likely" spend the rest of his life in prison. The detective added that if Hin didn't come clean, he was "going to get fried" because the park shooting was "the biggest case in Stockton." Hin responded, "This is between us?" The detective replied, "Yeah." Hin asked, "Nobody is gonna know?" The detective replied "Uh-huh." Hin proceeded to explain that he was there but not the shooter; that they "needed money" so they "robbed them"; that Hin ran up the hill after the robbery and then heard the shots; and that it was Kak who killed Martinez.

Finally, the detectives turned to the Hammer Lane shooting. Hin repeatedly denied knowing anything about the shooting. He eventually asked the detective, "What we're talking about, right here. This is not going to go out to nobody, is it?" Detective Seraypheap responded, "Me, [Detective John Reyes] and the [district attorney]." Hin expressed concern about being a "snitch" and "catch[ing] a bullet to [his] face." He eventually admitted that he was sitting in the front passenger seat of a car with "T-Bird" and "some people from Oakland." While stopped at a light, two people in the car began shooting, one of whom was a TRG member named "Demon." Hin claimed that he was not "even TRG yet" at the time of the shooting and that the other members in the car were trying to recruit him. Hin explained that he never reported the shooting because he was scared to say anything.

On Hin's motion to suppress, the trial court first found that the arresting officer properly advised Hin of his constitutional rights per *Miranda* and that Hin "made a knowing, intelligent and voluntary waiver of his rights." The court next found that, when the arresting officer later reminded Hin of his rights and Hin agreed to speak from the holding cell, that questioning "was within a reasonably contemporaneous period of the original advisement, approximately one hour later." The court also found that Hin's first interview, conducted around 4:00 a.m. and during which Hin said yes when the detective asked if he remembered his rights, was "within a reasonably contemporaneous period of the original advisement." Finally, the court found that Hin was properly advised of his *Miranda* rights during his second interview (conducted around 3:00 p.m.) and that his third interview at 7:00 p.m., which included a reminder of those rights, was reasonably contemporaneous to that second advisement.

Having found that Hin was properly advised per *Miranda* with respect to each phase of custodial interrogation, the trial court then turned to the question of whether Hin's waiver was invalid because he was intoxicated at the time of his arrest or because it was the product of coercion through threats of punishment and implied assurances of leniency. The trial court did not consider whether Hin's statements were inadmissible because he requested confidentiality. As to Hin's intoxication, the trial court explained that Hin's blood-alcohol content at the time of arrest was 0.08 percent, which would be "enough to arrest a person and charge a person, but it's barely enough to convict a person of driving at [.]08 or above." The court went on to observe that there was no testimony that defendant was drunk or did not know what he was doing. In fact, the arresting

20

officer testified that Hin "appeared to answer the questions appropriately. That he was making sense." "In other words," the court concluded, Hin "exhibited symptoms of having consumed alcohol, but it doesn't appear to me that he was so under the influence that he wouldn't be able to understand and waive his *Miranda* [r]ights." (Italics added.)

Finally, the court turned to the question of coercion during Hin's third interview. Reviewing the video and transcript, the trial court found "no direct promises of leniency" nor evidence of a threat sufficient to render the statement involuntary. The court explained: "And of course, the key phrase is, you need to come clean on this, all right, because if you don't you are going to get fried." The court explained, "I think it's important to watch the video and listen to the video. And the officers were very low key. It was non-threatening. The officer was not abusive. There was no force." Describing the word " 'fried' " as "ambiguous," the court focused on Hin's demeanor. "So what did the defendant do after this statement? The defendant never said anything about the death penalty. I don't believe there is any conversation anywhere else about the death penalty. The defendant didn't seem afraid. He didn't seem . . . as though he was scared of the death penalty. The defendant seemed more concerned about retaliation from his . . . crime partners than what was going to happen in court." On that basis, the court determined there "was no specific mention of the death penalty," concluding that Hin's custodial statements were voluntary.

### 2. *Analysis*

"Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to

the presence of an attorney, either retained or appointed." (*Miranda, supra*, 384 U.S. at p. 444; see *People v. Sims* (1993) 5 Cal.4th 405, 440.) The precise form of advisement is less important than the requirement that the substance of the rights be fully communicated. (See *People v. Hensley* (2014) 59 Cal.4th 788, 809.)

When reviewing constitutional claims regarding *Miranda* advisement and waiver, we will accept the trial court's findings if supported by substantial evidence but will "independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." (*People v. Cunningham* (2001) 25 Cal. 4th 926, 992; see also *People v. Storm* (2002) 28 Cal.4th 1007, 1022–1023.)

Hin raises several bases for his *Miranda* challenge. First, he argues that the trial court erred in finding a valid advisement and waiver of *Miranda* rights before his third interview. As relevant here, Hin was provided with a full advisement of his *Miranda* rights at the time of his arrest (approximately 12:30 a.m.), was asked if he remembered his *Miranda* rights while he waited in a holding cell (approximately 1:30 a.m.), was asked again if he remembered his rights (approximately 4:00 a.m.), and was given a second full advisement of his *Miranda* rights during his second interview (approximately 3:15 p.m.). Both of the interviews within this initial period concerned the shooting on Bedlow Drive. Later that evening (approximately 7:00 p.m.), a different group of detectives interviewed Hin about the shootings at American Legion Park and on Hammer Lane. Before this third interview, Detective Seraypheap asked Hin, "You remember reading your rights and all that?" and Hin

responded, "Yeah." Hin contends he should have been readvised in full of his rights before this third interview, which was conducted by different detectives and concerned different crimes.

"This court repeatedly has held that a *Miranda* readvisement is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' " (*People v. Smith* (2007) 40 Cal.4th 483, 504 (*Smith*).) We have recognized five factors to be weighed when considering that totality of circumstances: "1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that defendant subjectively understands and waives his rights." (*Ibid*.)

Several factors support the trial court's finding that readvisement was not necessary. First, less than four hours elapsed between the *Miranda* readvisement given prior to the second interrogation and the start of the third interrogation. We have found greater temporal gaps to be reasonably contemporaneous with prior advisements. (See, e.g., *People v. Pearson* (2012) 53 Cal.4th 306, 317 [27 hours]; *Smith, supra,* 40 Cal.4th at pp. 504–505 [12 hours].) Moreover, although the interviewers changed, the location of the interview remained the same between the last full *Miranda* advisement and the interview at issue. (Cf. *People v. Lewis* (2001) 26 Cal.4th 334, 387 [readvisement not necessary with change of interviewers

when "subsequent interrogation" is "part of an ongoing and cooperative process"].)  Furthermore, the brief reminder of Hin's rights given by Detective Seraypheap at the start of the third interview weighs against the need for readvisement.  (See *People v. Visciotti* (1992) 2 Cal.4th 1, 55 [citing with approval an officer's question if defendant "still wanted to waive his rights" as a sufficient reminder]; *People v. Pearson*, at p. 317 [similar].)

Finally, although it is true that Hin had no prior criminal justice experience, there are sufficient indications in the record that he understood and waived his rights throughout his time in custody.  (See *People v. Pearson, supra*, 53 Cal.4th at p. 317 [the defendant's continued contact and cooperation with officers after initial advisement tended to show he understood and waived his rights].)  Hin expressed no discomfort or unwillingness to talk, and he affirmatively responded each time he was asked if he understood his rights.  Within a roughly 19-hour period, Hin was advised of his *Miranda* rights twice and reminded of them three times, yet at each juncture he made no attempt to exercise those rights.  For these reasons, we conclude that, under the totality of the circumstances, the interview at issue was reasonably contemporaneous with the prior advisement given to Hin and thus readvisement was not necessary.

Hin contends that "high court precedent" is in conflict with our holding in *Smith* that "a *Miranda* readvisement is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' " (*Smith*, 40 Cal.4th at p. 504.)

Hin presents no persuasive reason why we should reconsider our "repeated[]" holdings on this issue. (*Ibid.*)

Second, Hin argues that his *Miranda* waiver was not knowing and intelligent in light of his request for confidentiality. Hin did not raise this specific argument in the trial court, and the trial court did not discuss what Hin now contends were requests for confidentiality in its ruling on Hin's motion to suppress the custodial statements. " 'As a result, the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings.' " (*People v. Gurule* (2002) 28 Cal.4th 557, 602 (*Gurule*).) We conclude that this claim was not preserved for appeal.

We further hold that had the issue been preserved, the exchange between Hin and Detective Seraypheap, when viewed in context, reflected a concern about gang retaliation and was not a request for confidentiality.

Hin cites *People v. Braeseke* (1979) 25 Cal.3d 691, vacated on other grounds *sub nom. California v. Braeseke* (1980) 446 U.S. 932, for the proposition that a "request to speak 'off the record' cannot constitute a knowing and intelligent waiver of rights which include the advisement that 'anything [a suspect] says can be used against him in a court of law.' " (*Braeseke*, at p. 702, quoting *Miranda, supra*, 384 U.S. at p. 479.) On their face, the exchanges between Hin and Detective Seraypheap could be understood as requests for and assurances of confidentiality. At the beginning of his custodial interview, Hin initially denied any involvement in the robbery and murder of Martinez in American Legion Park. Shortly after this initial denial, he asked Detective Seraypheap whether the

conversation was "between us" and whether "[n]obody [was] gonna know." Detective Seraypheap agreed to both questions. Immediately after, Hin admitted to his involvement and gave details about what happened at American Legion Park, although he denied being the shooter.

But later portions of the transcript indicate that Hin was expressing concern that the officers would inform other gang members of his statement rather than expressing a misunderstanding of the advisement that his statements could be used against him. After giving the officers details about what happened in American Legion Park, Hin asked Detective Seraypheap and Detective Reyes what would happen to him. They explained that they would "talk to the [district attorney]" and convey the information Hin had told them. Having already been informed that the district attorney would be told about his statements, Hin asked the detectives again, "This is not going to go out to nobody, is it?" Detective Seraypheap reiterated that it would go to him, Detective Reyes, and the district attorney. Hin responded that he was not trying to "be no snitch," that he was "try[ing] not to catch a bullet to my face either," and expressed concern that "[i]t ain't going to be safe for me." The detectives again told him that they would talk to the district attorney. After further back and forth, Hin again expressed that he wasn't trying to "snitch" and worried out loud that "[s]omeone, somebody is gonna know."

Given this context, we conclude that Detective Seraypheap "did not promise [Hin] that his statements would remain confidential, nor did [Hin] understand [Detective Seraypheap's] comment to mean that all that was said would remain confidential." (*Gurule*, *supra*, 28 Cal.4th at p. 604.) Hin

was told repeatedly that his statements would be conveyed to the district attorney, and his repeated expressions of concern in response were not about the legal consequences of his confession.  Rather, Hin appears to have feared for his personal safety should other members of TRG find out he had confessed.  His questions to the detectives about whether others would know what he said or if the conversation was "between us" were allusions to other members of TRG, not requests for confidentiality that reflected a misunderstanding of the *Miranda* warning.  To the extent that Hin argues that his confession was involuntary because it was induced by a false promise of confidentiality, we reject his claim for the same reasons.  (See *ibid*.)

Third, on his motion to suppress in the trial court, Hin argued that his *Miranda* waiver was not knowing and intelligent because he was intoxicated at the time of his initial advisement on arrest.  While Hin did not raise this additional argument on appeal, we nonetheless agree with the trial court that there is no evidence that Hin "was so under the influence that he wouldn't be able to understand and waive his *Miranda* [r]ights."  Moreover, this court "has repeatedly rejected claims of incapacity or incompetence to waive *Miranda* rights premised upon voluntary intoxication or ingestion of drugs" alone.  (*People v. Clark* (1993) 5 Cal.4th 950, 988.)  That Hin's blood-alcohol content was 0.08 percent when tested an hour after his first *Miranda* advisement, without more, does not establish that he was too intoxicated to make a knowing and intelligent waiver.

Finally, Hin argues that his confession regarding the American Legion Park robbery and murder was involuntary because the officers promised confidentiality and threatened

punishment if he did not "come clean" about the crimes. We disagree.

"The due process clause of the Fourteenth Amendment precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion." (*People v. DePriest* (2007) 42 Cal.4th 1, 34, citing *Dickerson v. United States* (2000) 530 U.S. 428, 433–434.) When considering whether a confession is voluntary, the test is "whether the defendant's will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534; see also *DePriest*, at pp. 34–35.) We apply a totality of the circumstances test to determine whether a confession is voluntary (*DePriest*, at p. 35), considering "whether the confession was ' "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence" ' " (*Hutto v. Ross* (1976) 429 U.S. 28, 30). " 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' " (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

Hin contends that Detective Seraypheap made unambiguous threats of punishment when he told Hin, "When you go to court, most likely, you know you, you'll probably spend the rest of your life in prison." The detective continued, "You need to come clean. Whether this guy fought with you. Whether you were not the shooter. You were just doing the talking. Whatever. You need to come clean on this, alright, cuz if you don't you're going to get fried. This case right here that American Legion Park shooting, this guy, is the biggest case in Stockton, yet, about what happened at that park. You know

why? Too many rich, too many rich people live around that area, and when something like that happen, it shocked everybody. Okay? So you need to come clean. If you were not the shooter, tell me like it is, about the shooter, okay? Don't bullshit me. Nothing like that, alright? You need to come clean now."

The detective's statement Hin would "get fried" if he didn't confess is fairly understood to suggest that the decision to charge the crime as a capital offense might hinge on Hin's confession. But we have said that "[r]eference to the death penalty does not necessarily render a statement involuntary." (*People v. Williams* (2010) 49 Cal.4th 405, 443 (*Williams*).) " '[A] confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand. [Citations.] We have found a constitutional violation in this context only where officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises.' " (*Ibid.*)

Having viewed the videotape of the interrogation, we conclude that "it is evident that neither the mention of the death penalty nor the deception overcame defendant's will" in this interaction. (*Williams, supra,* 49 Cal.4th at p. 443.) Significantly, Hin exhibited no signs of distress in response to Detective Seraypheap's reference to the death penalty. As the trial court noted, "the officers were very low key," and the statement was "non-threatening." Nothing about Hin's demeanor throughout the interrogation indicated that he was afraid, and he did not appear threatened by the officer's use of the phrase "get fried."

29

Hin relies on *People v. Johnson* (1969) 70 Cal.2d 469, a case concerning a pre-*Miranda* interrogation in which we held that the defendant's confession was not voluntary in light of various errors in the advisement of rights provided to him. In *Johnson*, we observed: "To someone unskilled and uncounseled in the law it might have offered a hope that since no money was taken in the robbery and if, as he claimed he did not do the shooting, that he might be cleared of any serious charges. Because of the felony-murder rule his statements amounted to a confession of first degree murder (see Pen. Code, § 189). It stretches the imagination to believe that he knowingly and intelligently waived his right to be free from self-incrimination." (*Id.* at p. 479.) Relying on *Johnson*, Hin argues that the detective's statements suggesting some relevance to the fact that he was not the shooter rendered his confession unknowing. Hin notes that he, like the defendant in *Johnson*, had no prior experience with law enforcement (apart from traffic matters). He notes that he "was so unskilled in the law that he didn't understand that he could be arrested for admitting that he drove the van during the drive-by shooting on Bedlow Drive . . . or arrested for murder by admitting that he participated in the fatal robbery in the park."

But the detective's statement to Hin "[did] not constitute an offer of leniency on the part of the police or the prosecution in return for a confession; it advised defendant that an accomplice is generally better off than a triggerman. That was sound advice . . . [as] an accomplice is far less likely to receive the death penalty than the triggerman." (*People v. Garcia* (1984) 36 Cal.3d 539, 546, overruled on other grounds as recognized in *People v. Lee* (1987) 43 Cal.3d 666, 676.) Unlike *Johnson*, this was a capital case in which the fact that Hin was

not the shooter could have some relevance at the penalty phase. To the extent that a benefit associated with not being the shooter could be inferred from the detective's remarks, it was " ' " 'merely that which flows naturally from a truthful and honest course of conduct' " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 993) because the particular circumstances of a homicide can constitute mitigating factors in the ultimate decision as to the appropriate penalty. And although Hin's question to Detective Seraypheap, "Am I gonna get arrested for [the murder]?" indicates a misunderstanding regarding the consequences of confessing his involvement, this confusion does not appear to be due to police misconduct and therefore does not render his confession involuntary. Significantly, the detectives, in urging Hin to "come clean," never suggested he would not be arrested for murder.

### C. Motion to Sever

Hin argues the trial court abused its discretion in denying his motion to sever the charges against him, violating his rights to due process, a fair trial, a reliable guilt and penalty determination, and his right to be free from cruel and unusual punishment under both the federal and state Constitutions.

Before trial, Hin moved to sever the American Legion Park charges from the other charges. He argued that severance was necessary because evidence of the two crimes was not cross-admissible and because the two crimes involved distinct motives: a gang-related turf war on Bedlow Drive versus a chance-encounter robbery at American Legion Park. In opposition, the prosecutor argued that joinder was permitted because all of the charged crimes were of the same class of offenses (crimes against persons), committed by common

perpetrators (Hin and Kak), and tied to a common weapon (the nine-millimeter handgun found in Bun's residence). He further argued that evidence of Hin and Kak's gang membership and joint participation in the crimes was relevant to the gang enhancement alleged for all counts charged and to the gang-related special circumstance alleged for the murder at American Legion Park, and was admissible to establish a common motive for the crimes in the park.

The trial court denied Hin's motion. The court found that the crimes were of the same class and were committed close in time to one another. And while observing there was "no evidence" the victims at American Legion Park "were involved in a gang at all," the court nevertheless found there was "strong evidence" to show that the counts related to the American Legion Park shooting fell within the gang enhancement provision of section 186.22. Finally, the court found that none of the charges was so weak that it would be "unduly prejudicial to join them with stronger cases."

Section 954 allows for the joint trial of "two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses." Where joinder is proper under section 954, "[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Soper* (2009) 45 Cal.4th 759, 773.) In determining whether a court abused its discretion in declining to sever properly joined charges, we first "consider the cross-admissibility of the evidence in hypothetical separate trials." (*Id.* at p. 774.) If the evidence is cross-admissible, then this "is normally sufficient to dispel any suggestion of prejudice

and to justify a trial court's refusal to sever properly joined charges." (*Id.* at p. 775.) If not, then we also consider "(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Ibid.*) "Even if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that 'the joint trial resulted in such gross unfairness as to amount to a due process violation.' " (*Landry, supra,* 2 Cal.5th at p. 77.)

"[I]n a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect." (*People v. Williams* (1997) 16 Cal.4th 153, 193.) Here, evidence of Hin's involvement with Kak, a member of TRG, during the American Legion Park crimes would have been admissible to demonstrate his motive for participating in the Bedlow Drive shooting. The reverse is also true: evidence of Hin's involvement in the Bedlow Drive shooting would have been admissible to establish his motive for the American Legion Park shooting. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 (*Samaniego*) ["Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related."].) Because the evidence known to the court at the time of its rulings suggested that the American Legion Park charges would have been cross-admissible in a hypothetical separate trial of

33

the other charges, Hin fails to show that the court abused its discretion in denying severance.

Hin argues that the trial court erred in denying the motion to sever because the prosecution presented no substantial evidence that Hin and Kak committed the crimes in American Legion Park as gang members, pointing to the fact that the jury acquitted Hin of the gang enhancement for the American Legion Park shooting. This argument confuses the sufficiency of the evidence argument for the gang-related charges with Hin's argument that the trial court committed reversible error in denying his motion to sever the American Legion Park counts from the other counts. What is relevant here is that the prosecutor *did* allege gang-related charges stemming from the American Legion Park shooting, and the trial court accurately determined that the evidence from the American Legion Park shooting and Bedlow Drive shooting would be cross-admissible, notwithstanding the jury's subsequent acquittal on the gang enhancement.

Having found that the trial court did not abuse its discretion in denying severance of the American Legion Park charges from the remaining charges, we must determine "whether events *after* the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*People v. Merriman* (2014) 60 Cal.4th 1, 46.) In arguing that he was denied a fair trial, Hin concedes that the denial of severance was not prejudicial to his murder and attempted murder convictions in light of his admissions during interrogation. Hin asserts only that the denial of severance was prejudicial to the jury's gang-murder special-circumstance

34

finding. Below we consider the jury's gang-murder special-circumstance finding and reverse that finding on other grounds.

## III. GUILT PHASE ISSUES

### A. Murder and Attempted Murder

Hin was convicted of one count of first degree murder with special circumstances and six counts of attempted murder with a finding that the attempts were willful, deliberate, and premeditated. Count 1 was for the murder of Martinez, count 3 was for the attempted murder of Pizano, and counts 5 through 9 were related to the Bedlow Drive shooting.

Hin argues that there is insufficient evidence to convict him of the murder of Martinez with special circumstances following the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which amended Penal Code sections 188 and 189 to eliminate the natural and probable consequences doctrine for first degree and second degree murder (§ 188, subd. (a)(3)), and to heighten the requirements for felony murder (§ 189, subd. (e)). In the alternative, he argues that reversal of his murder conviction is required because the trial court's instructions to the jury included the now invalid natural and probable consequences theory and felony-murder theory.

Hin also argues that because the Legislature's enactment of Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775) eliminated the natural and probable consequences doctrine for attempted murder, his attempted murder convictions should be reversed because the trial court's alternative-theory error was not harmless beyond a reasonable doubt. Hin further argues the evidence was insufficient to support the jury instruction on the "kill zone" theory of attempted murder for counts 5 and 8. Finally, Hin argues the evidence was insufficient to support the

jury's verdict as to the five counts of attempted murder related to the Bedlow Drive shooting.

As explained below, we affirm Hin's murder conviction because the trial court's alternative-theory errors were harmless beyond a reasonable doubt. We reverse Hin's six attempted murder convictions because the trial court's alternative-theory errors were not harmless beyond a reasonable doubt. And we conclude the evidence is insufficient to sustain two of the counts of attempted murder related to the Bedlow Drive shooting.

### 1. *Senate Bill 1437 and the Natural and Probable Consequences Doctrine*

Under the natural and probable consequences doctrine, " 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.) A finder of fact relying on the natural and probable consequences doctrine is not concerned with whether the aider and abettor actually foresaw the nontarget crime, but rather whether the nontarget crime was reasonably foreseeable when judged objectively. (*Ibid.*)

In 2018, the Legislature enacted Senate Bill 1437, which eliminated the natural and probable consequences theory of murder. (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 amended Penal Code section 188 to provide that "[e]xcept as stated in subdivision (e) of Section 189 [governing felony murder], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be

imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.) Senate Bill 1437 also narrowed the scope of the felony-murder exception to this general rule, providing that a defendant who was neither the actual killer nor acted with the intent to kill can be liable for murder only if he was a "major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e)(3), added by Stats. 2018, ch. 1015, § 3.) In *People v. Gentile* (2020) 10 Cal.5th 830, 849 (*Gentile*), we held that the statute as amended bars a conviction for first or second degree murder under a natural and probable consequences theory. We further held "that the procedure set forth in section [1172.6] is the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal." (*Id.* at p. 839.)

In October 2021, the Governor signed into law Senate Bill 775. (Stats. 2021, ch. 551.) In its findings and declarations, the Legislature explained that Senate Bill 775 "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable [*sic*] consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a).) The legislation also allows a person convicted of murder or attempted murder on a natural and probable consequences doctrine to challenge the validity of the conviction on direct appeal (*id.*, § 2 [revised former § 1170.95, subd. (g) (now § 1172.6, subd. (g); see Stats. 2022, ch. 58, § 10)]), abrogating our contrary holding in *Gentile*. (See *Gentile, supra*, 10 Cal.5th at p. 839.) Senate Bill 775 also abrogates our holding in *People v. Favor* (2012) 54 Cal.4th 868, 880, that "[u]nder the natural and probable

consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense." (See Stats. 2021, ch. 551, §§ 1, subd. (a), 2, subds. (a), (g).)

Before guilt phase deliberations in this case, the trial court instructed the jury that it could convict Hin of the murder of Martinez under three theories of derivative murder liability: (1) direct aiding and abetting premeditated murder (CALJIC No. 3.00), (2) natural and probable consequences liability arising from aiding and abetting the target crimes of kidnapping and robbery (CALJIC No. 3.02), and (3) first degree felony murder for a killing by another, "whether the killing is intentional, unintentional or accidental" which occurs during the "commission of the crime of robbery or kidnapping" (CALJIC former No. 8.27).

The trial court also instructed the jury that it could convict Hin of attempted murder for both incidents on two theories of derivative liability: (1) directly aiding and abetting attempted murder with "express malice aforethought, namely, a specific intent to kill unlawfully another human being" (CALJIC No. 8.66), and (2) if attempted murder "committed by a principal" was a natural and probable consequence of a lesser target crime "originally aided and abetted" by Hin (CALJIC No. 3.02). For the allegation of attempted murder of Pizano at American Legion Park (count 3), the court instructed the jury that it could find Hin guilty of that crime if it was the natural and probable consequence of aiding and abetting the target crimes of robbery or kidnapping. (CALJIC No. 3.02.) For the Bedlow Drive shooting, the court instructed the jury that it

could find Hin guilty of all five counts of attempted murder (counts 5, 6, 7, 8 and 9) if he aided and abetted the target crimes of either "shooting at an occupied dwelling, shooting at an occupied motor vehicle, or discharging a firearm from a motor vehicle."

The prosecutor, in turn, repeatedly relied on the pre-Senate Bill 1437 felony murder and natural and probable consequences theories during closing argument. With respect to the murder and attempted murder at American Legion Park, the prosecutor argued: "Because this shooting occurred during the robbery . . . this is in fact murder . . . . Because under the felony murder rule, when murder is in fact murder — when someone dies during the robbery or kidnapping or attempted robbery and kidnapping or flight therefrom, whether it was intentional or unintentional or accidental." The prosecutor also argued the natural and probable consequences theory: "When you look at the extent of liability, that you are not only liable for the crimes you commit, but those crimes which are the natural and probable consequences, it becomes even quite clear, whether or not he, in fact, intended to aid and abet the crime of murder, he is liable because of the robbery that, in fact, took place." The prosecutor summarized the theories: "I submit to you there's only one conclusion and that, quite clearly, that it is foreseeable, based upon all the evidence you've seen in this case and all the activities, because the target crime is robbery and, in fact, the actual crime is committed, attempted murder and murder are, in fact, reasonably foreseeable in this analysis, are the natural and probable consequences that Mao Hin is clearly guilty, not only under the felony-murder theory, not only under the aiding and abetting theory, but under the aiding and abetting theory and natural and probable consequences."

Similarly, with respect to the Bedlow Drive charges, the prosecutor argued: "We did not have to prove Mao Hin, in fact, being the shooter because he was the driver in this attempted murder, in fact, aiding and abetting Rattanak Kak as he, in fact, fired off the many different rounds, and Sarun Chun, he's just as liable as everyone else. [¶] Because he even agreed to commit the crimes of shooting from a car and the other crimes of shooting at occupied homes and occupied vehicles, these are foreseeable crimes that would lead to attempted murder under the natural and probable consequences liability."

It is undisputed the jury was presented with both the valid theory that Hin acted with intent to kill and invalid theories of felony murder and of natural and probable consequences as a basis to find him guilty of murder and attempted premeditated murder. "Where a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred." (*In re Lopez* (2023) 14 Cal.5th 562, 580 (*Lopez*).) Accordingly, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) A reviewing court may hold such an error harmless "where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*Lopez*, at p. 568.) In making this assessment, a court must "rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Ibid.*) As

explained below, on the record here the standard for harmlessness has been met as to the murder conviction but not as to the attempted murder convictions.

The Attorney General concedes that the five counts of attempted murder related to the Bedlow Drive Shooting (counts 5 through 9 of the indictment) must be reversed. The Attorney General explains that he is "compelled, on this record, to concede that the invalid-theory error here might have contributed to appellant's guilt," and he "cannot conclude that the presentation to appellant's jury of a now invalid theory was harmless beyond a reasonable doubt" as to these counts. Indeed, the record indicates that the prosecution in closing repeatedly argued the natural and probable consequences doctrine as to the Bedlow Drive shooting. For example, the jury was told that "[w]e did not have to prove Mao Hin, in fact, being the shooter because he was the driver in this attempted murder" and that shooting toward the carport and residences "are foreseeable crimes that would lead to attempted murder under the natural and probable consequences liability." During deliberations, the jury twice asked the court for clarification of the word "probable" in the natural and probable consequences instruction and was reinstructed on it three times.

"The Attorney General bears the burden of showing that the error was harmless beyond a reasonable doubt. (*Chapman* [*v. California* (1967)] 386 U.S. [18,] 24; [*In re Martinez* (2017) 3 Cal.5th 1216, 1227].)" (*Lopez, supra*, 14 Cal.5th at p. 585.) As the Ninth Circuit has put it, finding harmless error under *Chapman* despite the government's concession of prejudice "requires a double level of certainty: we must be convinced that the error was 'harmless beyond a reasonable doubt' and that

'satisfaction of that standard is beyond serious debate.' " (*U.S. v. Brooks* (9th Cir. 2014) 772 F.3d 1161, 1171.) In light of his burden on this issue, and in view of how the prosecution argued and sought to prove counts 5 through 9, we agree with the Attorney General that on this record it is not clear beyond a reasonable doubt that the jury did not rely on the now invalid theory in reaching Hin's attempted murder convictions on counts 5 through 9.

As to count 1 (the murder of Martinez) and count 3 (the attempted murder of Pizano), however, the Attorney General argues that the instructions on the natural and probable consequences doctrine and felony murder were harmless beyond a reasonable doubt because the jury necessarily found the requisite culpability to convict Hin of the murder of Martinez and attempted premeditated murder of Pizano. We accordingly focus our analysis on counts 1 and 3.

### 2. *First Degree Murder with Robbery, Kidnapping and Gang Special Circumstances (Count 1)*

The trial court instructed the jury with only one valid theory of first degree murder of Martinez: direct aiding and abetting of premeditated murder. That theory required the jury to find " 'that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' " (*Lopez*, *supra*, 14 Cal.5th at p. 585, quoting *People v. Chiu* (2014) 59 Cal.4th 155, 167, superseded by statute on other grounds, as noted in *Gentile*, *supra*, 10 Cal.5th at pp. 848–849.)

As the Attorney General concedes, the two other theories — the natural and probable consequences instructions

and the felony-murder instructions — have been invalidated. The Attorney General argues, however, that these instructional errors were harmless beyond a reasonable doubt because the jury's positive findings as to the special circumstances, combined with the "overwhelming evidence" that Hin was a major participant in the underlying felony who acted with reckless indifference to human life, would have necessarily led the jury to conclude that he was guilty of first degree felony murder under current law.

Specifically, the Attorney General points to the jury's true findings as to the felony-murder special circumstances, which required the jury to find that Hin aided and abetted Kak either with the "intent to kill" or with "reckless indifference to human life." The Attorney General contends that "the jury's findings as to the underlying offense and the special circumstances, along with the evidence supporting a finding of intent to kill and reckless indifference . . . render any instructional error harmless."

We hold that on the facts of this case, the jury's findings on the felony-murder and gang-murder special circumstances in combination render the instructional errors harmless beyond a reasonable doubt and demonstrate that the jury made the findings necessary to convict Hin on a valid theory of felony murder. We further hold that the evidence was sufficient for a jury to find that Hin intended to kill Martinez.

The trial court instructed the jury on the felony-murder special circumstances as follows: "If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true

43

unless you are satisfied beyond a reasonable doubt that such defendant, with the intent to kill:  Aided, abetted, counseled, commanded, induced, solicited, requested or assisted any act or in the commission of the murder of the first degree; or with reckless indifference to human life and as a major participant aided, abetted, counseled, commanded, induced, solicited, requested or assisted in the commission of the crime of robbery or kidnapping, which resulted in the death of a human being, namely, Alfonso Martinez."  The court further instructed:  "A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being."

The Attorney General argues that the jury's true finding as to the felony-murder special circumstances, which required it to find that Hin aided and abetted the robbery or kidnapping of Martinez either "with the intent to kill" or "with reckless indifference to human life and as a major participant," is alone sufficient to fill the gaps in the felony-murder instruction Hin's jury received.  However, we recently rejected such an approach to pre-Senate Bill 1437 felony-murder special-circumstances findings in *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*), and we do so again here.

In *Strong*, we considered whether a defendant convicted of felony murder was barred from resentencing relief following the enactment of Senate Bill 1437 because the jury that convicted him of felony murder "also found true felony-murder special-circumstance allegations that he was a 'major participant' who acted with 'reckless indifference to human life.' " (*Strong*, *supra*, 13 Cal.5th at p. 703.)  We concluded that because the jury's felony-murder special-circumstances findings were made before

our decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), "which for the first time provided substantial guidance on the meaning of the two relevant statutory phrases," the defendant could make out a prima facie showing of eligibility for relief. (*Strong*, at p. 703.) This was true, we held, "even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Id.* at p. 710.)

As we discussed in *Strong*, our decisions in *Banks* and *Clark* addressed a key constitutional question: how culpable must a person be to be sentenced to death for felony murder? (*Strong*, *supra*, 13 Cal.5th at p. 705; see *Banks*, *supra*, 61 Cal.4th at p. 794; *Clark*, *supra*, 63 Cal.4th at pp. 616–617.) In *Banks*, we delineated several factors that a jury should consider in weighing whether a felony-murder defendant's participation was " 'major' " enough to qualify for the death penalty: his role in planning the target offense; supplying the lethal weapon; awareness of the particular dangers posed by the crime, weapon, or past conduct of other participants; presence and actions (or inaction) at the scene of the killing; and actions after lethal force was used. (*Banks*, at p. 803, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 152 (*Tison*).) We held that a defendant's participation in an armed robbery does not by itself satisfy the Eighth Amendment's requirements. (*Banks,* at p. 805.)

In *Clark*, we provided further guidance on the "reckless indifference" element of felony murder, noting the relevance of several factors: use of or awareness of a weapon; physical presence at the scene and opportunity to restrain confederates or aid victims; duration of the crime; knowledge of any threat

45

confederates might represent; and efforts taken to minimize risks of violence. (*Clark, supra,* 63 Cal.4th at pp. 618–623.) We similarly held that "while the fact that a robbery involves a gun is a factor beyond the bare statutory requirements for first degree robbery felony murder, this mere fact, on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life for the felony-murder aider and abettor special circumstance." (*Id.* at p. 617.)

"[W]hen Senate Bill 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark.*" (*Strong, supra,* 13 Cal.5th at p. 710.) We have recognized that "*Banks* and *Clark* represent the sort of significant change that has traditionally been thought to warrant reexamination of an earlier-litigated issue." (*Id.* at p. 717.) Indeed, there are now standard jury instructions based on the *Banks/Clark* factors for juries to consider when deciding whether a defendant who did not cause the death was a major participant in the felony and acted with reckless indifference to human life. (See CALCRIM No. 540B [Felony Murder: First Degree — Coparticipant Allegedly Committed Fatal Act]; CALCRIM No. 703 [Special Circumstances: Intent Requirement for Accomplice After June 5, 1990 — Felony Murder].) Further, as we explained in *Strong,* "in the wake of *Banks* and *Clark,*" the arguments available to felony-murder defendants changed significantly to the point of potentially "fundamentally alter[ing] trial strategies . . . to focus on proving they were guilty at most of a noncapital homicide." (*Strong,* at p. 719.)

Here, as in *Strong*, the jury made its true findings on the felony-murder special circumstances prior to our court's decisions in *Banks* and *Clark*, and prior to their codification by Senate Bill 1437. As in *Strong*, because those special circumstance findings were made without understanding what degree of culpability is required, they are not sufficient, standing alone, to establish that Hin "is in a class of defendants who would still be viewed as liable for murder under the current understanding of the major participant and reckless indifference requirements." (*Strong*, *supra*, 13 Cal.5th at p. 718.)

The Attorney General argues that *Strong* is inapposite because of its different posture. The question in *Strong* was whether the defendant had made out a prima facie case for resentencing relief under section 1172.6, whereas the case before us involves a direct appeal. It is true that "a harmless error analysis on direct appeal is distinct from the . . . inquiry under section 1172.6." (*People v. Wilson* (2023) 14 Cal.5th 839, 872 & fn. 12.) But the record-based inquiry under section 1172.6 that "look[s] to the jury's verdicts, and the factual findings they necessarily reflect," is equally helpful in determining whether the defendant was prejudiced by the alternative-theory error. (*People v. Curiel* (2023) 15 Cal.5th 433, 465 (*Curiel*).) We conclude, as we did in *Strong*, that a pre-*Banks/Clark* felony-murder special-circumstance finding does not by itself establish that the jury convicted a defendant of murder on a valid theory of felony murder.

At the same time, the case before us differs from *Strong* in an important respect. Here, unlike in *Strong*, the jury also returned a "true" finding on the gang-murder special

47

circumstance (§ 190.2, subd. (a)(22)). As to this special circumstance, the jury was instructed in relevant part: "To find that the special circumstance 'intentional killing by an active street gang member' is true, it must be proved: [¶] 1. The defendant intentionally killed the victim; or with the intent to kill, aids and abets, counsels, commands, induces, solicits, requests, or assists the actual killer." The jury's true finding as to this special circumstance means it necessarily found that Hin acted "with the intent to kill" when he participated in the robbery with Kak.

The question is whether this jury finding, in conjunction with the other special circumstance findings, necessarily means that the jury found Hin guilty on a valid theory of felony murder. "As amended by Senate Bill 1437, a defendant is guilty of first degree felony murder if he is the 'actual killer' (§ 189, subd. (e)(1)); if, 'with the intent to kill,' he aids or abets 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)); or, if he was a 'major participant in the underlying felony' and 'acted with reckless indifference to human life' (*id.*, subd. (e)(3))." (*People v. Wilson, supra*, 14 Cal.5th at p. 873.) Here, we focus our review on the third prong.

Hin does not dispute that he was a major participant in the robbery of Martinez and Pizano; he contests only the second element — i.e., that the jury's findings do not show reckless indifference to human life. In addition to the undisputed major participant element, the jury found true the special circumstance that Hin intentionally killed the victim while an active participant in a criminal street gang. The jury's findings in this case, in combination, establish the elements of felony murder under current law (§ 189, subd. (e)(3)), rendering the

instructional errors harmless beyond a reasonable doubt. While it may have been possible to have concluded from the evidence that Hin merely intended to rob Martinez, the jury plainly did not so conclude; the jury's special circumstance finding shows it found that Hin intended to kill Martinez. Because the evidence is sufficient to support this finding, we owe deference to the jury's determination. (See *Lopez, supra,* 14 Cal.5th 562, 584 [appellate court examining alternative-theory error must consider whether "any rational jury would surely have rendered the same verdict had it been properly instructed"].)

The jury's finding that Hin intended to kill Martinez — based on evidence of his observed behavior during the course of the armed robbery — satisfies the amended felony-murder statute's "reckless indifference to human life" mens rea requirement. (§ 189, subd. (e)(3).) It is true, as Hin argues, that the fact of Hin's participation in an armed robbery is insufficient, without more, to establish reckless indifference to human life. (*Banks, supra,* 61 Cal.4th at p. 805.) Rather, "[r]eckless indifference to human life has a subjective and an objective element. (*Clark, supra,* 63 Cal.4th at p. 617.) As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' (*Banks, supra,* 61 Cal.4th at p. 801; see *Clark,* at p. 617.) As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' (*Clark,* at p. 617, quoting Model Pen. Code, § 2.02,

subd. (2)(c).).” (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

The jury’s findings satisfy both the subjective and objective elements and distinguish this case from the “garden-variety armed robbery, where death might be possible but not probable.” (*Banks, supra*, 61 Cal.4th at p. 802.) As to the subjective component, the jury necessarily found that Hin was a willing participant in the robbery and not only “consciously disregard[ed]” the risk of death that the robbery posed to Martinez’s life but in fact intended for him to be killed. (*Scoggins, supra*, 9 Cal.5th at p. 677.) As to the objective component, the jury’s finding of Hin’s intent to kill Martinez necessarily relied on evidence of Hin’s conduct during the encounter in the park, which elevated the risk of Martinez’s death beyond “those risks inherent in any armed robbery.” (*Clark, supra*, 63 Cal.4th at p. 623.) This is not a case where the prosecution sought to prove intent to kill in the form of a confession or witness testimony as to the defendant’s spoken intent. Instead, it is undisputed that Hin orchestrated what transpired: he helped plan the robbery; he knew a gun would be used; he gave all the orders to Martinez and Pizano while Kak held the gun, including requiring Martinez and Pizano to walk to a darker area of the park at gunpoint; and he did not render aid after the shooting. In light of the record before us, we conclude that it is this evidence on which the jury necessarily relied in finding Hin’s intent to kill Martinez, and this evidence shows that Hin’s conduct created an objectively “ ‘grave risk of death’ ” that satisfies the reckless indifference standard. (*Banks, supra*, 61 Cal.4th at p. 808, quoting *Tison, supra*, 481 U.S. at p. 157.) Together with Hin’s undisputed major participation “in the underlying felony,” which satisfies the

amended statute's actus reus requirement (§ 189, subd. (e)(3)), the jury's finding of Hin's intent to kill Martinez, on the evidence here, establishes that the jury found him liable on a theory of felony murder that is in accord with current law.

At oral argument, Hin argued that the jury's special circumstance findings cannot be considered because in filling out the verdict form, the jury "do[esn't] get to the specials until there's been a valid conviction for first-degree murder." According to Hin, given the instructional error on first degree murder, no further findings on the verdict form can be considered because we cannot know if or how the jury would have filled out the rest of the form had the error not occurred. But instructional error does not require us to overlook findings that the jury indisputably made, and we have not previously adopted Hin's suggested approach to the harmless error analysis. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 200 [looking to "the jury's robbery-murder special-circumstance finding" to decide if it "render[ed] harmless" instructional errors impacting the first degree murder conviction].)

Hin also contends that the jury's intent finding on the gang-murder special circumstance is inextricably linked to whether he was "further[ing] the activities of a criminal street gang." In his view, the intent finding cannot be considered in isolation from the gang-related elements of the special circumstance. However, this argument is not supported by the jury instructions, which required the jury to make an intent finding as an independent element: "To find that the special circumstance 'intentional killing by an active street gang member' is true, it must be proved: [¶] 1. The defendant intentionally killed the victim; or with the intent to kill, aids and

abets, counsels, commands, induces, solicits, requests, or assists the actual killer." The jury was instructed that the gang-related aspects of the special circumstance finding were separate elements. That is, the jury was told that to find the special circumstance true, it also had to find: "[¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The members of that gang engaged in or have engaged in a pattern of criminal gang activity; [¶] 4. The defendant knew that the gang members engaged in or have engaged in a pattern of criminal gang activity; and [¶] 5. The murder was carried out to further the activities of the criminal street gang." On this record, we hold that the jury's intent finding was independent and undisturbed by the other elements of the gang-murder special circumstance.

We further conclude that there was substantial evidence to support the jury's finding of Hin's intent to kill Martinez. "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

The evidence here included testimony from Pizano, the surviving victim. Pizano testified that although Kak held the gun throughout the encounter, it was Hin who gave all the orders. This included the order to walk down the levee to a darker area of the park, at gunpoint. She further testified that Hin and Kak were whispering to each other as they approached. In addition, she testified that immediately before the shooting,

Hin made a comment about how dangerous it was to walk in the park late at night and both he and Kak started laughing. Further, Officer Nance testified that because Hin was older than Kak, Hin had a leadership role in their gang when compared with Kak. Viewing this evidence in the light most favorable to the judgment, we hold it was reasonable for the jury to infer that Hin and Kak devised a plan for Kak to shoot Martinez, that Hin moved them to a darker area of the park to facilitate the shooting, and that his comment about the danger of walking in the park late at night indicated his intent to kill.

In sum, the jury's special circumstances findings, which are supported by substantial evidence in relevant part, indicate that the jury necessarily found Hin guilty under a valid theory of felony murder. (See *Lopez*, *supra*, 14 Cal.5th at p. 568.) We conclude that the alternative-theory errors as to count 1 were harmless beyond a reasonable doubt and accordingly affirm Hin's first degree murder conviction.

### 3. *Attempted Murder of Pizano (Count 3)*

Hin also argues that the natural and probable consequences alternative-theory error as to the attempted murder conviction of Pizano (count 3) warrants reversal. The Attorney General contends that the jury's true finding on the gang-murder special circumstance confirms beyond a reasonable doubt that the jury necessarily found that Hin acted with intent to kill when he aided and abetted the attempted premeditated murder of Pizano.

Although this instruction and the jury's finding on the gang-murder special circumstance pertained only to count 1 (the murder of Martinez), the Attorney General argues that it also resolves the question of intent as to count 3, the attempted

murder of Pizano: "The jury's true finding as to this special circumstance establishes that it found, beyond a reasonable doubt, that appellant acted with an intent to kill Martinez. Because the murder of Martinez and the attempted murder of Pizano occurred at the same time and place, the finding of an intent to kill as to Martinez establishes that the jury also found that [Hin] intended to kill Pizano, who was shot in the head just after Martinez was killed." The Attorney General further argues that this intent finding in turn leads to the "inexorable conclusion" that the jury would have necessarily convicted Hin on a valid theory of direct aiding and abetting, rendering any instructional error harmless beyond a reasonable doubt. We disagree.

In *Lopez*, the defendant was convicted of first degree premeditated murder as an aider and abettor. (*Lopez*, *supra*, 14 Cal.5th at p. 567.) The jury found true the gang-murder special circumstance (§ 190.2, subd. (a)(22)) and the criminal street gang sentencing enhancement (§ 186.22, subd. (b)(1)) as to that murder. (*Lopez*, at p. 56.) Lopez petitioned for writ of habeas corpus, alleging that the jury had been instructed on the natural and probable consequences theory of aiding and abetting first degree murder, which we found invalid in *Chiu*, *supra*, 59 Cal.4th 155, and that the error was not harmless beyond a reasonable doubt. (*Lopez*, at p. 567.) The Court of Appeal held that the error was harmless beyond a reasonable doubt based on the gang-murder special circumstance and the " 'overwhelming' " evidence against Lopez. (*Ibid.*)

We reversed, explaining that "[w]hile the relevant language" of the special circumstance "evokes similar concepts, it does not cover all of the elements of direct aiding and

abetting." (*Lopez, supra*, 14 Cal.5th at p. 587.) Specifically, we explained that the special circumstance encompassed two of the three required elements of direct aiding and abetting: that the defendant " 'aided or encouraged the commission of the murder' " and had " 'the intent or purpose of committing, encouraging, or facilitating its commission.' " (*Lopez*, at p. 587.) The third element of direct aiding and abetting — " 'knowledge of the unlawful purpose of the perpetrator' "(*ibid.*) — is not encompassed by the jury's special circumstance finding because a defendant could aid or assist the actual perpetrator as a factual matter without knowing that the actual perpetrator, too, intended to kill. Accordingly, we held that the special circumstance verdict alone was not enough to find the error harmless beyond a reasonable doubt. (*Ibid.*)

Here, as in *Lopez*, the jury's true finding on the gang-murder special circumstance does not establish all the elements of accomplice liability for murder or attempted murder. As noted, the gang-murder special circumstance pertained only to the murder of Martinez. The jury did not return any finding that Hin intended to kill Pizano or that Hin had " 'knowledge of the unlawful purpose' " of the actual perpetrator, Kak. (*Lopez, supra*, 14 Cal.5th at p. 587.)

When the verdict alone does not establish the harmlessness of alternative-theory error, a reviewing court may examine " 'what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' ([*Aledamat, supra*, 8 Cal.5th] at p. 15.) In other words, if ' "[n]o reasonable jury that made all of these findings could have failed to find" ' the facts necessary to support a valid theory, the alternative

theory error was harmless. (*Ibid.*)" (*Lopez*, *supra*, 14 Cal.5th at p. 592.)

The Attorney General contends that on the evidence presented, "the finding of an intent to kill as to Martinez establishes that the jury also found that appellant intended to kill Pizano." According to the Attorney General, "[t]he evidence established that at American Legion Park, [Hin] and Kak whispered as they approached Pizano and Alfonso Martinez. Kak drew a gun and pointed it at Martinez's and Pizano's heads. [Hin] and Kak took Martinez's money and Pizano's purse, and then forced Martinez and Pizano off the ridge to where it was darker. As they walked, Kak or appellant shoved Martinez, and Pizano started to cry. [Hin] told Pizano, 'don't cry, byotch.' [Hin] and Kak took the remainder of their property. [Hin] and Kak laughed as they moved away, and [Hin] remarked that it was dangerous to walk in the park at night. Three or four shots were then fired, hitting Martinez twice and killing him. Pizano was struck in the head and the leg." The prosecutor argued, and the Attorney General urges here, that Hin "intended to make sure that no witnesses survived the robbery."

The Attorney General's interpretation of the evidence is reasonable, but it is not the only reasonable reading of the record. During interrogation, Hin denied knowing that Kak was going to shoot either victim, and he expressed surprise at the shooting. When asked why he dropped the clothes and other items they took from Martinez and Pizano, Hin responded, "I didn't thought [*sic*] he was going to shoot them. . . . I thought it was going to be a robbery and just take it and just run." The true finding on the gang-murder special circumstance indicates that the jury disbelieved Hin's statement insofar as he denied

an intent to kill Martinez, but it does not necessarily establish that the jury believed Hin intended to kill Pizano or knew of Kak's intent to kill either Martinez or Pizano. According to Pizano's testimony, one of the men shoved Martinez before the shooting (there is no evidence of similar physical pressure on Pizano), and Martinez was standing between Pizano and the men when the shots were fired — facts that might have indicated the men perceived Martinez to pose a greater threat of resistance. Further, the jury could have inferred that Hin intended to reduce the risk that Pizano or Martinez could identify him by moving them away from the light for the remainder of the robbery. And although there is evidence that Hin and Kak whispered as they approached Martinez and Pizano, the record contains no indication of what was said.

Although the jury's true finding on the gang-murder special circumstance necessarily includes a finding that Hin intended to kill Martinez, it is an inferential step to conclude that Hin also intended to kill Pizano. Moreover, it would require an even greater inference to conclude from the jury's finding that Hin had knowledge of *Kak's* intent to shoot Pizano or Martinez. Such inferences may be reasonable. But it is not "impossible, on the evidence, for the jury to find [that Hin intended to kill Martinez] without *also* finding" both that he intended to kill Pizano and knew of Kak's intent to shoot the victims. (*Aledamat, supra,* 8 Cal.5th at p. 15.) The record of conviction thus does not establish beyond a reasonable doubt that the jury would have found Hin guilty of all the elements of direct aiding and abetting as to the attempted murder of Pizano. (*Lopez, supra,* 14 Cal.5th at p. 587.)

Accordingly, we conclude that the Attorney General has not met his burden to show beyond a reasonable doubt that the jury would have found Hin guilty of the attempted murder of Pizano on a proper theory. In light of the Attorney General's concession regarding the attempted murders at Bedlow Drive, we accordingly reverse all six counts of attempted murder (count 3 and counts 5 through 9).

### 4. *Availability of Retrial, Sufficiency of the Evidence, and the Kill Zone Theory for Attempted Murder*

Hin contends that retrial is impermissible as to the five counts of attempted murder at Bedlow Drive because of insufficient evidence. Hin relies on a similar argument as a basis to reverse his convictions for shooting at an inhabited dwelling (counts 10 and 12) and shooting at an occupied motor vehicle (count 13). As explained below, we reject these arguments except as to the two counts of attempted murder of victims who were located inside the residences at the time of the shooting. As to these counts, we conclude the evidence was insufficient to support a conviction under the only valid theory on which Hin was tried: direct aiding and abetting. We decline to decide whether double jeopardy bars retrial of these two counts.

The double jeopardy clause of the United States Constitution provides that no person may "be subject for the same offence to be twice put in jeopardy of life or limb." (U.S. Const., 5th Amend.) The California Constitution affords the same protection. (Cal. Const., art. I, § 15.) Nonetheless, a defendant who successfully appeals from a judgment of conviction may be tried a second time for the same offense unless the conviction is set aside for insufficiency of the

evidence. (*Sanabria v. United States* (1978) 437 U.S. 54, 63 & fn. 15, 64.) A finding of insufficient evidence is the functional equivalent of a judgment of acquittal, upon which retrial is prohibited. (*Burks v. United States* (1978) 437 U.S. 1, 10–11 (*Burks*); see *id.* at p. 17 [double jeopardy is a rule against "afford[ing] the government an opportunity for the proverbial 'second bite at the apple' "].)

Hin concedes there was sufficient evidence to support the verdict of the attempted murder of Pizano at American Legion Park (count 3) but argues the evidence was insufficient to support the guilty verdict as to the five counts of premeditated attempted murder related to the Bedlow Drive shooting (counts 5 through 9), particularly with respect to the two victims who were injured inside the residences: Pen (count 5) and Hing (count 8). Because we conclude all five counts of attempted murder at Bedlow Drive must be reversed, we address Hin's sufficiency of the evidence claim to determine whether retrial is permissible.

We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) As discussed, the jury was instructed on two theories of murder — direct aiding and abetting and the natural and probable consequences doctrine — one of which we now find improper. This leaves the remaining, properly instructed theory of direct aiding and abetting. We proceed to assess only the sufficiency of the

evidence as to the properly instructed direct aiding and abetting theory.

"[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Hill* (1998) 17 Cal.4th 800, 851.)

As discussed, Hin was arrested hours after the shooting at Bedlow Drive while driving his van with Kak and Chun. Police found shell casings in the van that matched those found at Bedlow Drive. Hin admitted to driving the van but claimed he did not know Kak had a gun. He claimed he and Kak were at a gas station when they were confronted by a group of men, and he decided to follow the men "to see where they kick[ed] it at." This led him to Bedlow Drive, where Hin said "he heard gunshots and then he said that Kak pulled out a gun and started shooting" at a group of people on Bedlow Drive. After the shooting, Hin and Kak went to a party and hung out together. Hin claimed during his interview that he never saw the gun again after the shooting, but Bun testified that Hin gave him the gun that was linked to the shooting to hold onto because he and Kak had "just c[o]me from a problem."

Witnesses at Bedlow Drive testified that they heard one or more rounds of multiple shots fired from the street in front of the residences; some of the witnesses saw a van similar to Hin's van. Witnesses testified that the van slowed down as it passed,

then made a U-turn and passed by again.  Police found no guns at Bedlow Drive and no evidence that shots were fired from the residences or carport toward the street and Hin's van.  Officer Daniel Gatto testified that Bedlow Drive was in an area known to be the turf of the Asian Street Walkers (ASW) gang, a rival of TRG.

The evidence was sufficient to establish that, following a confrontation, Hin drove Kak and Bun to a residence in a rival gang's territory, slowed down to allow Kak to shoot, then made a U-turn to drive past the residence again so Kak could continue to shoot.  The evidence was also sufficient to show that Hin and Kak remained together after the shooting, and then Hin made arrangements to pass off the gun that was used in the shooting.  Finally, Hin denied any involvement in the shooting until Kak informed him that he had already admitted his own participation in the shooting.  Based on this evidence, it would have been reasonable for the jury to infer that Hin shared Kak's intent to kill and his intent to shoot at an occupied vehicle and inhabited dwellings, at least with respect to those victims that were outside of the residences during the shooting.  Accordingly, we reject Hin's sufficiency of the evidence claim with respect to counts 6, 7, 9, 10, 12, and 13.

There remains the question of whether the evidence was sufficient to establish the intent to kill those victims who were injured inside the residences on Bedlow Drive:  Pen (count 5) and Hing (count 8).  As we have explained, "the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine."  (*People v. Canizales*

(2019) 7 Cal.5th 591, 602 (*Canizales*).) "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Ibid.*) Under what has come to be known as the "kill zone" theory, "the nature and scope of the attack directed at a primary victim may raise an inference that the defendant ' "intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." ' " (*Ibid.*)

In *Canizales*, we explained that the kill zone theory may only be applied to establish the specific intent to kill when the jury concludes "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death — around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) "Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Ibid.*) We concluded that the evidence presented in *Canizales* was not sufficient to support an instruction on the kill zone theory (*id.* at p. 611) and that the instruction provided in that matter (the standard CALCRIM No. 600 instruction on attempted murder) was deficient because it did not define the term "kill zone" or instruct the jury "to consider evidence regarding the circumstances of defendants' attack when determining whether defendants 'intended to kill [the target victim] by killing everyone in the kill zone' " (*Canizales*, at p. 613).

*Canizales* identified a number of relevant circumstances from which a jury could properly infer the defendant intended to create a zone of harm, including "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) Applying these factors, the facts here are, in some respects, more suggestive of kill-zone liability than those in *Canizales*. There, we observed that the perpetrator fired five shots from a distance of either 100 or 160 feet away from the intended target and that "the attack occurred at a block party on a wide city street, not in an alleyway, cul-de-sac, or some other area or structure from which victims would have limited means of escape." (*Id.* at p. 611.) Here, witnesses testified that there were between 15 and 30 shots fired that evening 30 feet away from the entrance to the enclosed carport (and less than 45 feet away from the adjacent residence) from multiple guns, at least one of which was evidently capable of penetrating into the residences behind the carport.

Where this case differs significantly from *Canizales*, however, is that the jury was instructed it could rely on the kill zone theory as to the two victims who were injured inside the residences adjoining the carport. We have not had an occasion to extend the rationale of *Canizales* to reach victims within a residence or otherwise not visible to the shooter. Our decision in *Canizales* relied on *People v. Vang* (2001) 87 Cal.App.4th 554, 564 (*Vang*) for the proposition that "the placement of the shots, the number of shots, and the use of high-powered wall-piercing weapons created a reasonable inference that the defendants intended to kill every living being inside the residences at which they shot." (*Canizales*, *supra*, 7 Cal.5th at p. 610; see *Vang*, at

pp. 563–564.) But this case is distinguishable from *Vang*, where "[t]wenty-one shell casings from an AK series assault rifle and five shotgun shells were found at the scene" and "[a]t least 50 bullet holes" in the front of the residence, "with the majority focused [*sic*] on" the unit in which five of the victims were located. (*Vang*, at p. 558.) Here, the evidence showed that between 15 and 30 shots were fired from a nine-millimeter handgun, with most shots fired at the men in the carport.

As in *Vang*, the evidence showed gunfire damage within the residences. At 619 Bedlow, where one victim was shot through the window, the only firearm damage observed was the bullet hole in the window. But at 615 Bedlow, where the second victim was shot while sitting on the couch watching football, officers observed bullet holes in the south wall, in the window of the residence, above an electrical outlet near the fireplace, and in the television set, as well as bullet damage to a bed frame inside the residence. Unlike in *Vang*, there was no evidence that the shots were specifically targeting the residence, nor was there evidence that the shooters used the type of high-powered weapon at issue in *Vang*. We thus decline to extend the rule articulated in *Canizales* to permit reliance on the kill zone theory on these facts. Instead, we hold that the evidence was insufficient to establish an intent to kill Sobin Pen (count 5) and Sokkhon Hing (count 8) under the properly instructed theory of direct aiding and abetting.

The parties disagree on whether this holding triggers the constitutional guarantee against double jeopardy and precludes retrial of those two counts. According to the Attorney General, Hin may be retried because in addition to presenting the jury with a theory for which we find the evidence insufficient, the

prosecution tried him on a second theory that is now invalid. Retrial must be allowed, according to the Attorney General, even though at oral argument he could not "at this time, think of another theory upon which [these counts] could validly be retried."

The Attorney General argues this result is compelled by our holdings that double jeopardy is "inapplicable" when evidence is insufficient because of a postconviction change in the law. (*People v. Shirley* (1982) 31 Cal.3d 18, 71.) As we have explained, double jeopardy "achieves its aim — i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge — by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. [Citation.] But the incentive serves no purpose when, as here, the prosecution did make such a case under the law as it then stood; having done so, the prosecution had little or no reason to produce other evidence of guilt." (*Ibid*.) In other words, where the prosecution's original burden of proof at trial is later altered, "it [is] unrealistic to assume that the prosecution, with a perfect case for proof of [the invalid theory], necessarily presented all available evidence relating to [the valid theory.]" (*People v. Garcia, supra*, 36 Cal.3d at pp. 557–558; see *U.S. v. Aiello* (2d Cir. 2024) 118 F.4th 291, 301 [collecting federal cases establishing a similar rule against evaluating sufficiency of the evidence for a crime whose elements are " 'later altered by a change in the applicable law' " on the ground that the government should not be held to the evidence it presented at trial when it had no notice of what it needed to prove].) Applying these cases, the Court of Appeal in *People v. Hola* (2022) 77 Cal.App.5th 362, 371–377, held that double jeopardy did not bar retrial where a defendant was tried

and convicted solely under the now-invalid natural and probable consequences theory.

Hin's trial differs from these cases in that the prosecution has already tried him on a valid theory. Hin's jury was presented with two theories of attempted murder liability that were each, standing alone, sufficient to convict. Unlike the legal error in *Shirley*, *Garcia*, *Hola*, and the federal case law cited above, the legal error here removed one of those avenues to a conviction while leaving intact another independent theory that was actually litigated. From all appearances, the prosecution fully availed itself of its opportunity to litigate the valid theory. At trial, the prosecution called a total of 25 witnesses to prove the attempted murders at Bedlow Drive, including "12 civilian witnesses present at Bedlow Drive at the time of the shooting," 11 investigating police officers, and gang and firearms experts. In addition, the prosecution presented evidence of Hin's interrogations about the shooting at Bedlow Drive. In closing, the prosecution argued direct aiding and abetting to the jury, explaining that "[w]e did not have to prove Mao Hin, in fact, being [*sic*] the shooter because he was the driver in this attempted murder, in fact, aiding and abetting Rattanak Kak as he, in fact, fired off the many different rounds." And the jury was instructed on direct aiding and abetting "at the request of the prosecution."

We further note that the Attorney General, in his briefing and at oral argument, gave no indication of what additional evidence the prosecution could offer to support a conviction under the valid theory. Ultimately, we need not decide whether double jeopardy applies to the two counts of attempted murder on which we find the evidence insufficient. We leave this

66

question for the trial court to consider should the district attorney seek retrial. Retrial is permitted, however, on the remaining counts of attempted murder as to Pizano (count 3), Ream Voeuth (count 6), Nath Sok (count 7), and Krisna Khan (count 9). We hold the evidence was sufficient to support Hin's convictions for shooting at an inhabited dwelling (counts 10 and 12) and shooting at an occupied motor vehicle (count 13).

### B. Gang Allegations

Hin next contends that all the gang findings in this case, including the gang-murder special circumstance, must be reversed and the case remanded for resentencing in light of recent legislation amending the definition of criminal street gang activity. As explained below, we hold that the evidence presented at trial is insufficient to establish that members of TRG participated in a " 'pattern of criminal gang activity.' " (§ 186.22, subd. (e)(1).) Accordingly, we vacate the gang enhancements on all six counts relating to the Bedlow Drive shooting, the conviction of the crime of active participation in a criminal street gang, and the gang-murder special circumstance.

### 1. Background

As recounted above, the jury convicted Hin of several crimes with gang-related allegations: the first degree murder of Martinez, which the jury found "was committed by active participants in a criminal street gang to further the activities of . . . the gang within the meaning of" section 190.2, subdivision (a)(22); three counts of attempted murder and three counts of aiding and abetting of shooting at an inhabited motor vehicle and at an inhabited residence related to the Bedlow Drive incident, which the jury found were committed "for the

benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members within the meaning of" section 186.22, subdivision (b)(1); and one count of the crime of active participation in a criminal street gang, in violation of section 186.22, subdivision (a).

In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022. (Stats. 2021, ch. 699.) Assembly Bill 333 made the following changes to the law on active gang participation and gang enhancements. "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have

commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)

"Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)  Although Assembly Bill 333 does not expressly address the gang-murder special circumstance set forth in section 190.2, subdivision (a)(22), the latter statute defines "criminal street gang" by express cross-reference to section 186.22, subdivision (f).

Hin contends that he is entitled to the benefit of the new legislation and that all gang-related findings in this case must be vacated.  The Attorney General concedes that the ameliorative provisions of Assembly Bill 333's amendments to Penal Code section 186.22 apply to cases, including this one, that were pending on direct appeal when the legislation took effect — a position with which we agreed in *Tran*.  (See *Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.)  He argues, however, that remand is unnecessary as to either the special circumstance or the other gang allegations "because the jury would have made the same findings even under AB 333's more stringent new requirements."  Although the Attorney General previously argued that the amendments cannot be applied to the special circumstance allegation because such application would be an unconstitutional amendment to section 190.2, subdivision (a)(22), which was enacted by ballot initiative, we

concluded otherwise in *People v. Rojas* (2023) 15 Cal.5th 561, 566. We address each remaining argument in turn, mindful that "[w]hen a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra,* 13 Cal.5th at p. 1207.)

### 2. *Elements of the Gang Allegations Under Assembly Bill 333*

Hin contends that the prosecution did not prove that the predicate crimes conveyed a "common benefit" to the gang that was "more than reputational." (§ 186.22, subd. (g).) As recounted above, the prosecutor presented evidence of three uncharged predicate crimes underlying the gang allegations: (1) the conviction of Rathana Chan for sales of a controlled substance under Health and Safety Code section 11352 committed on July 30, 2001; (2) the sustained juvenile petition for Sophear Om for burglary committed on February 15, 2002; and (3) the conviction of Sarun Chun for second degree murder in the shooting at Hammer Lane and Lan Ark Drive on September 12, 2003. The prosecutor's gang expert confirmed that drug sales and burglary "generate[] revenue" and thereby "support the gang." She further testified that "hurt[ing] or kill[ing] the people that are rival gang members" were forms of retaliation that benefit gangs. She also testified that gangs benefit from the commission of such crimes because they enhance the gang's reputation. As noted, such reputational benefit is no longer sufficient to sustain a gang allegation under

section 186.22, subdivision (g) as amended by Assembly Bill 333. (See Stats. 2021, ch. 699, § 3.)

We recently considered a similar claim of "common benefit" alternative-theory error in *People v. Cooper* (2023) 14 Cal.5th 73 (*Cooper*). As here, the jury in *Cooper* received gang enhancement (§ 186.22, subd. (b)(1)(C)) instructions prior to the passage of Assembly Bill 333. (*Cooper*, at p. 738.) And as in *Cooper*, the Attorney General concedes that when jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the standard of *Chapman v. California* (1967) 386 U.S. 18. (*Cooper*, at p. 739.) In conducting this review, we are mindful that "[t]hough it may be 'permissible, as a general matter, to use circumstantial evidence to prove a common benefit that is more than reputational' [citation], our inquiry here is not whether a jury could have found a more-than-reputational common benefit." (*People v. Lamb* (2024) 16 Cal.5th 400, 452, italics omitted.) Unlike a sufficiency of the evidence claim, where we view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence, "our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the opposite conclusion." (*People v. Mil* (2012) 53 Cal.4th 400, 418, italics omitted.)

In *Cooper*, the defendant was convicted of first degree murder with gang and firearm enhancements. (*Cooper*, *supra*, 14 Cal.5th at p. 738.) The gang expert testified that "a murder like the one in th[at] case would benefit the gang by eliminating a rival and by maintaining respect," but did not testify about

how the two alleged predicate offenses — robbery and sale of narcotics convictions — benefited the gang. (*Id.* at p. 741.) We explained that although there was evidence that robbery and narcotics sales were among the types of activities in which a gang typically engaged, the record contained no evidence that the specific alleged predicate offenses benefited the gang. (*Cooper*, at pp. 743–744.) Therefore, we reasoned, a rational jury could find that only the predicate offenders themselves benefited from the offenses in a non-reputational manner, rather than "the gang as a whole" as Assembly Bill 333 requires. (*Cooper*, at p. 739.) Accordingly, we held that the trial court's failure to instruct the jury that alleged predicate offenses must have commonly benefited the gang in more than a reputational manner was not harmless beyond a reasonable doubt. (*Id.* at p. 746.)

As in *Cooper*, the gang expert here testified that the types of crimes alleged as predicate offenses — drug sales, burglary, and murder of a rival gang member — could have offered both reputational and non-reputational benefits to a gang. For example, she testified that gang members may generate revenue for the gang by engaging in "drug sales," "stealing cars," and "burglaries." She also opined that gang members engage in drive-by shootings as a way to enhance their own as well as the "entire gang's status." However, as the Attorney General acknowledges, Detective Nance did not offer any testimony as to whether the specific alleged predicate offenses of Chan's drug sale or Om's burglary benefited TRG as a whole, and the record is otherwise silent as to the circumstances of those two predicate offenses. In sum, the evidence does not show that either crime was committed for the benefit of the gang rather than for personal gain. On this record, as in *Cooper*, a rational juror

72

could have concluded that these two predicate offenses "were committed for personal gain alone." (*Cooper, supra,* 14 Cal.5th at p. 744.)

Therefore, even accepting the Attorney General's argument that the third predicate offense of murder of a rival gang member necessarily benefited the gang as a whole, Assembly Bill 333's requirement that the jury find that at least two predicate offenses were committed for a "common benefit" that is "more than reputational" is not satisfied (§ 186.22, subds. (e)(1), (g).) Because we cannot say the error was harmless beyond a reasonable doubt, reversal of each gang allegation is required under Assembly Bill 333. This applies to the gang enhancements attached to six counts of attempted murder (which we reverse on other grounds) and to the conviction for active gang participation in count 15. The changes effected by Assembly Bill 333 apply equally to the gang-murder special circumstance (§ 190.2, subd. (a)(22)) (see *People v. Rojas, supra,* 15 Cal.5th at p. 566), and require reversal of that finding as well.

### 3. *Sufficiency of the Evidence of the Gang-Murder Special Circumstance*

Hin argues that double jeopardy precludes retrial of the gang-murder special circumstance because the evidence at trial was insufficient to prove that Hin aided and abetted the murder of Martinez to further the activities of TRG, even under the statute in effect at that time. (Cf. *People v. Sek* (2022) 74 Cal.App.5th 657, 669–670 [retrial is permitted where the appellate court finds only that the evidence was insufficient under the law as amended posttrial by Assembly Bill 333]; *id.* at p. 669 [" ' " 'Where . . . evidence is not introduced at trial

because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' " ' "].)  Hin does not challenge the sufficiency of the evidence under the law as it existed at trial as to the gang enhancements related to the Bedlow Drive shooting, so our discussion here is limited to the evidence pertaining to the murder at American Legion Park.

Section 190.2, subdivision (a)(22) provides for the death penalty or life imprisonment without the possibility of parole where "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  Hin contends that the evidence was insufficient to show that he "aided and abetted Kak with the intent to kill Martinez in order 'to further the activities' " of TRG.  We agree.

The Attorney General's main theory — that Hin and Kak committed the robbery and murder to recoup funds lost from gambling and that they intended to use the stolen assets to benefit TRG — rests almost entirely on Detective Nance's expert testimony.  As noted, she opined that the robbery and murder of Martinez at American Legion Park were gang related and were committed to promote the TRG gang based upon the fact that two members of the same gang were together, that they were motivated to recover their gambling losses because a gang needs money to survive, and her opinion that the crime was a form of "training" of a younger gang member and the gun that was used was "a TRG gun."  Other than this expert testimony, the record contains little in support of the Attorney General's theory.

74

The prosecutor argued mixed motives as to the charged crimes in closing argument, though his focus was primarily on the reputational benefits to TRG. With respect to the murder and attempted murder in American Legion Park, he argued that Hin was motivated to recoup the money he had lost gambling that evening, though without specifying whether the financial benefit would accrue to him personally or to the gang. But with respect to the gang-murder special circumstance, the prosecutor argued only that the murder was carried out "in furtherance of the gang" "so that the gang can exhibit its power and get that type of influence over its rivals and because of the ability of the gang to, in fact, carry out its activities and not to have police intervene, such as these individuals" — i.e., a reputational benefit. As to the gang enhancement for that incident (which the jury found "not true"), the prosecutor argued a mixed motive: "We . . know it was for the benefit of the gang, because it filled the pockets of these gang members and increased their status as showing their heart and their ability to, in fact, carry out the gang's activities."

"[T]here have always been limits to what expert testimony could show about a defendant's reasons for committing a crime." (*People v. Renteria* (2022) 13 Cal.5th 951, 966 (*Renteria*).) Although in *Renteria* we elucidated these limits in the context of testimony concerning a gang enhancement under section 186.22, subdivision (b)(1), its discussion of the limits on expert testimony is relevant to the gang-murder special circumstance as well.

We explained in *Renteria*: "First, this sort of expert opinion proves too much. If generalized testimony about the reputational benefits of a defendant's violent crime were,

standing alone, sufficient to support an inference that the defendant committed the crime for the benefit of the gang, with specific intent to promote, further, or assist its members' crimes, it would mean that essentially every violent crime committed by a gang member could be punished more severely under section 186.22(b) purely because of the defendant's gang membership. . . . [¶] Second, describing a benefit to the gang is only part of the equation; the prosecution must also establish that the defendant committed the underlying felony with the specific intent to promote, further, or assist criminal conduct by other gang members — a requirement we have described as knowledge of at least some of the criminal activities of the gang and its members and intent to further those activities. Without more, evidence that committing a violent crime can enhance the gang's reputation for viciousness in the community does not support an inference that the defendant committed a particular violent crime for the benefit of the gang and with the intent to facilitate known criminal activity by other gang members." (*Renteria*, *supra*, 13 Cal.5th at pp. 966–967.)

"None of this is to suggest that prosecutors may not rely on expert opinion to connect the defendant's crime with the conduct of the gang and its members; to the contrary, we have previously held that ' "[e]xpert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1) gang enhancement.' (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) But important limitations apply to the use of such testimony. Expert opinion, typically guided by hypothetical questions, ' "must be rooted in facts shown by the evidence." ' (*Id.* at p. 1045.) They ' "may not be based 'on assumptions of fact without evidentiary support [citation], or on speculative or

conjectural factors.' " ' (*Id.* at p. 1046.)" (*Renteria, supra,* 13 Cal.5th at p. 967.) "Across cases, appellate courts have relied on similar factors — whether the defendant's gang membership was apparent to observers, whether the victim was a gang member or rival of the defendant's gang, and whether retaliation for prior gang activity or disputes prompted the defendant's crime — to describe the limits of reputation evidence and ensure that it is grounded in specific facts that show the defendant acted on behalf of a gang rather than for personal reasons." (*Id.* at p. 968.)

In light of the principles above, we hold that Detective Nance's testimony was insufficient to show that the murder of Martinez was carried out to "further the activities of the criminal street gang" under the law as it existed at the time of trial. To reach such a conclusion on this record would stray into the realm of speculation and conjecture and would not be "grounded in specific facts." (*Renteria, supra,* 13 Cal.5th at p. 968.) There is no evidence that the money lost by Kak and Hin when gambling was gang money, nor is there any evidence that the money obtained from the robbery would have gone or did go to the gang. There is also no evidence that the murder was committed for the financial benefit of the gang.

As to the testimony that the crime was a form of "training," this theory rests on a mischaracterization of Pizano's account. The prosecution asked Detective Nance to explain the significance of "an older gang member barking out orders and the younger gang member holding the gun." Detective Nance responded that this was consistent with "an older member or a more well-versed member . . . coaching, helping somebody else commit these crimes and helping them along the way."

77

However, the record does not show that Hin gave instructions to Kak or was "coaching" him along. Rather, Pizano's testimony was that Hin issued orders to her and Martinez telling them what to do. Hin communicated with Kak in whispers as they initially approached Pizano and Martinez, but the two did not speak to each other as the events transpired. The simple fact that Hin was older than Kak is not sufficient to show that the crime was a form of "training," at least where no other evidence supported Detective Nance's testimony. Given these missing links, Detective Nance's testimony does not constitute substantial evidence that the murder was committed for the benefit of the gang.

The Attorney General also points to evidence that (1) the murder of Martinez was committed by two members of the TRG gang; (2) a TRG gun was used; and (3) prior to the murder Hin and Kak were whispering to each other. These facts establish that both were active participants in TRG at the time of the murders, but they do not show that the murder was committed to further the activities of TRG. Not every crime committed by gang members is for the benefit of the gang. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

Finally, the Attorney General relies on Detective Nance's testimony that the commission of the murder could increase respect for TRG by instilling fear in others. But there was no evidence that Pizano or Martinez were members of a rival gang or were targeted for a gang-related reason. Nor is there evidence that American Legion Park is within TRG territory or the territory of a rival gang, or that Hin and Kak said or did anything to indicate their membership in TRG. With no evidence that the victims or the public would know that the

crime was committed by members of TRG, there is nothing to suggest that the murder was intended to, or actually did, elevate the status of TRG. Were we to conclude otherwise on this record, then virtually any crime committed by a gang member could be said to further the gang's activities by virtue of the person's gang membership. Such a rule would "raise significant constitutional concerns." (*Renteria*, *supra*, 13 Cal.5th at p. 967.)

It is true we said in *Albillar* that "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang . . . .' " (*Albillar*, *supra*, 51 Cal.4th at p. 63.) But in that case, the victim and her assailants were acquaintances, and she "knew that at least two of her assailants were members of [a gang]." (*Id.* at pp. 51–52, 63.) One assailant had a gang tattoo on his face, and the victim " 'feared that since the suspects were gang members they [would] come after her family.' " (*Id.* at p. 53.) In response to a hypothetical based on the facts of the case, the expert explained: " 'More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [a gang] conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth. That is elevating [the gang's] reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.' " (*Id.* at p. 63.) Here, there is no evidence that Hin and Kak identified themselves to Martinez and Pizano as members of TRG, or that Martinez or Pizano otherwise knew Hin and Kak were members of TRG. (See *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363 [evidence insufficient to support a gang enhancement where "nothing in the record indicate[d] that [defendant] or his companions did

anything . . . to identify themselves with any gang, other than wearing clothing with red on it" and "there was no evidence that [the victim] or any of the other persons who witnessed the crime knew that gang members or affiliates were involved"].)

Because the record does not contain sufficient evidence from which the jury could have found that the murder was committed to further the activities of TRG even under the law as it existed at the time of trial, retrial of the gang-murder special-circumstance finding is not permitted.

Hin claims that the invalidity of the gang-murder special circumstance requires reversal of the death judgment. However, the jury properly considered two other valid special circumstance findings — kidnapping-murder and robbery-murder (§ 190.2, subd. (a)(17)(A), (B)) — and "an 'invalidated sentencing factor' does not 'render the [death] sentence unconstitutional' if 'one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.' " (*People v. Debose* (2014) 59 Cal.4th 177, 196.) The facts that were presented to the jury as to the gang-murder special circumstances could properly be considered as circumstances of the charged crimes under section 190.3, factor (a) (to the extent they concerned the charged crimes at American Legion Park and Bedlow Drive) or section 190.3, factor (b) (to the extent they concerned the uncharged crime at Hammer Lane). "Because the jury was authorized to give aggravating weight to these circumstances . . . our vacation of the [gang-murder] special circumstance finding do[es] not require reversal of the penalty." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1354.)

Because we hold that the evidence was insufficient to support the gang-murder special circumstance, we need not address Hin's arguments challenging its validity on the grounds that the trial court erred by failing to sua sponte instruct the jury that Hin must have specifically intended for the murder in American Legion Park to further the activities of a criminal street gang, and that the trial court did not adequately respond to a jury request related to the gang-murder special circumstance.

## C. Kidnapping-Murder Special-Circumstance Finding

The jury was presented with three special circumstance allegations and returned true findings on all three: robbery-murder, kidnapping-murder, and gang-murder. Hin contends the evidence was insufficient to support the finding of kidnapping-murder. In reviewing this claim, "we apply the same test used to determine the sufficiency of the evidence to support a conviction of a criminal offense. We 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 790–791.)

To prove the special circumstance of kidnapping, "if there is specific intent to kill, it is only required that there be proof of the elements of" kidnapping, "even if the felony of kidnapping . . . is committed primarily or solely for the purpose of facilitating the murder." (§ 190.2, subd. (a)(17)(M).) To prove the crime of simple kidnapping, "the prosecution must generally

'prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.) Hin disputes only the last element, referred to as the asportation element.

We addressed the asportation element for simple kidnapping in *People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*). We explained that, in determining whether the movement in question was " ' "substantial in character," ' " "the jury should consider the totality of the circumstances." (*Id.* at p. 237.) "Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Ibid.*)

On the record before us, we conclude that there is sufficient evidence of asportation. The evidence established that Hin and Kak apprehended Martinez and Pizano while they were walking on the path on top of the levee in American Legion Park. They took Martinez's cash and Pizano's purse, and then the man without the gun "pointed" and told them to " '[g]o down there by the gate,' " indicating a fence adjacent to the park. By Pizano's estimate, defendants and their victims walked about 15 feet down the hill. The area at the bottom of the levee was "extremely dark," albeit closer to neighboring homes. A detective who responded on the night of the homicide estimated

that Martinez's body was found "maybe 30 feet, give or take" from the top of the levee; another officer testified that Martinez's body was found 35 feet from the walkway.

A rational trier of fact could have concluded that the victims were moved a substantial distance based on the factors articulated in *Martinez*. The movement to the bottom of the hill increased the risk of harm to the victims by isolating them from other park patrons in a more secluded area where they were less visible to others. Similarly, a rational finder of fact could have determined that the darkness decreased the likelihood of detection and enhanced defendants' opportunity to commit additional crimes. Indeed, during his interview with law enforcement, Hin admitted to telling the victims to "stay away from the light" or "to go to the dark side" because Pizano had "seen [his] face." And because the evidence suggests that Kak murdered Martinez at the bottom of the levee, a rational juror could have also determined that "[t]he movement not only increased the risk of harm to the victims, but it also caused additional harm in fact." (*People v. Simmons* (2015) 233 Cal.App.4th 1458, 1472, italics omitted.)

It is true that "contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Martinez, supra*, 20 Cal.4th at p. 237.) But the victim's movement in this case — 30 to 35 feet down a hill at gunpoint — is enough to justify the consideration of contextual factors. (See *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435–1436 [considering *Martinez*'s contextual factors and finding sufficient evidence of asportation, where victim was moved 15 feet to the inside of his apartment to facilitate the defendant's search for gang members].)

Hin also suggests that the alleged kidnapping was only incidental to the robbery of Martinez. "[W]hether the victim's forced movement was merely incidental to the [associated crime] is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.'" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.) For the reasons above, a rational trier of fact could have determined that the movement of the victims increased the risk of harm to the victims, decreased the likelihood of detection, and enhanced defendants' opportunity to commit additional crimes. For those same reasons, a rational trier of fact could also determine "[t]his case is thus unlike the brief and trivial movements of the robbery victims around a room . . . or of a robbery victim from the teller area of a bank to a back room where the vault was located . . . movements found to be merely incidental to commission of the offense." (*Id.* at pp. 1153–1154, citations omitted.)

Finally, although independent felonious intent is not a requirement of the special circumstances, Hin argues the Attorney General is estopped from arguing this point because the trial court granted the prosecutor's request to instruct the jury pursuant to CALJIC No. 9.50. That instruction provides in relevant part: "In determining whether a distance that is more than slight or trivial is substantial in character, you should consider the totality of the circumstances attending the movement, including, but not limited to, the actual distance moved, or whether the movement increased the risk of harm above that which existed prior to the movement, or decreased the likelihood of detection, or increased both the danger inherent in a victim's foreseeable attempt to escape and the attacker's enhanced opportunity to commit additional crimes. *If*

*an associated crime is involved, the movement also must be more than that which is incidental to the commission of the other crime.*" (Italics added.) We reject Hin's estoppel argument and note that the jury's true finding in light of this instruction provides further support for our conclusion that the evidence was sufficient to support the jury's special circumstance finding.

### D. Admission of Rap Song

Hin claims that the trial court erred when it permitted the prosecution to admit into evidence a rap song, "Bang Bang," from a CD that police found in his bedroom. Hin argues that the Legislature's recent enactment of section 352.2 of the Evidence Code, which restricts the admission of rap lyrics and other forms of creative expression into criminal proceedings, should apply retroactively to his direct appeal. Hin contends that Evidence Code section 352.2 would bar the admission of the rap song and, in the alternative, that it was inadmissible under Evidence Code section 352 as well. Hin argues that admission of this evidence at both his guilt and penalty-phase proceedings resulted in prejudice that rendered his trial fundamentally unfair.

The Courts of Appeal have split on whether Evidence Code section 352.2 applies retroactively to cases that are not yet final. (Compare *People v. Venable* (2023) 88 Cal.App.5th 445, 456, review granted May 17, 2023, S279081 [Evid. Code, § 352.2 "is ameliorative and therefore applies to cases that are not yet final"] with *People v. Ramos* (2023) 90 Cal.App.5th 578, 596, review granted July 12, 2023, S280073 [Evid. Code, § 352.2 is "not an ameliorative enactment" and therefore "does not apply retroactively"] and *People v. Slaton* (2023) 95 Cal.App.5th 363, 376, review granted Nov. 15, 2023, S282047 [same].)

Here we need not reach the question of whether Evidence Code section 352.2 is an ameliorative change in the law that applies retroactively to nonfinal convictions under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 because we find that the court's admission of the "Bang Bang" song at the guilt and penalty phases was an abuse of discretion under the law as it stood at the time of Hin's trial, specifically Evidence Code section 352. We conclude that this error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836.

### 1. Facts

Officer Christopher Friedmann helped execute the search warrant of Hin's residence. During the search of Hin's bedroom, Officer Friedmann seized a CD case with writing on it and four CDs. The CD case, originally the case of a Brian McKnight album, "had what appeared to be TRG written on it and Rascal gang written on it." Three of the CDs had "TRG" inscribed on them. One white CD had the word Raskal written on it, with the letters "CK" with the "C" crossed out. In addition, a crossed out "ABZ" was also written on the CD with the word "fuck" appearing directly above. The white CD did not "appear to be . . . commercially produced" or otherwise meant for mass retail distribution.

During the search of Chun's residence, police officers recovered from his bedroom another CD case with "several CDs with writing on them" inside. Six of the CDs had "TRG written across" them. One also had the words "Raskal," "CK" with the "C" crossed out, and the phrase " 'bang, bang' " inscribed.

### a. Guilt Phase Testimony

Relying on his "training and experience in criminal street gangs," Officer Friedmann testified about the gang significance

of the writing on the CDs found in Hin's bedroom. He testified that on the white CD, the accentuated "CK" referred to "Crip killer" and the crossing out of the "ABZ" signaled "dis'ing that gang" or "paying them disrespect."

The prosecution again introduced the CD cases and CDs from Hin's and Chun's bedrooms during the testimony of gang expert Detective Kathryn Nance. Detective Nance opined that the CDs were primarily of the "homemade-type" variety, not found in stores. The prosecution asked Detective Nance if there was any gang significance to the CDs. She said there was. Detective Nance confirmed the markings were "a way of identifying yourself as a TRG gang member." She opined that "CK" stood for "Crip killer." The prosecution then asked whether the CDs in exhibit 321, from Chun's bedroom, were "not unlike the CD that we had here in People's [exhibit] 326, the CDs from Mao Hin's residence." Detective Nance testified that the CDs found in the two exhibits were very similar in terms of the writings on them, as well with regard to the songs.

The prosecution then attempted to play for the jury a particular track that was recorded on two of the CDs, one found in Hin's residence and the other from Chun's residence. Entitled "Bang, Bang," the song ran for about three minutes. The defense objected on relevance grounds. Invoking Evidence Code section 352, Hin's attorney argued that it would be "repetitive" and an "undue consumption of time" for the jury. Kak's attorney objected on the basis that it was prejudicial. The trial court overruled the objections. The court observed that since the CD was found inside Hin's house, it would allow it to be played. The court remarked that even if the CD that was to be played was the one found at Chun's house, it would still be "technically" relevant. However, the court also admonished the prosecutor to

play the CD only once: "I'll let you play it one time, but I don't want to hear it again in argument or anything. They can, but I don't want to hear the [district attorney] play it again."

The prosecution explained that the track on the CD found in Hin's apartment skips, so that he had "to start it on one CD and then complete it on the other." "Maybe that's God telling you something," the court stated. The prosecution then played the song before the jury, first from the CD found at Hin's residence, and then from the CD found at Chun's residence.

The song lyrics include descriptions of violence and threats of violence, including "Bang, bang you're fuckin' with that rascal gang (gunshots)"; "with a .9 millimeter . . ."; "we rascals (unintelligible) head back to the killing field"; "I'm a strait apple murderer"; "Pop the clip in never hesitate to get my trip in"; "TRG is gonna blast cuttin' apples in half"; "we sky high findin dead ones (unintelligible) screamin bloody redrum"; "if you dare step up all you're gonna hear is bang bang"; and "label me your suspect in apple death." The lyrics also include descriptions of sexualized violence, such as "you wrap them lips around my dick" and "ya I fuck your sister." Other lyrics include references to gray bandanas, like "we gray rag" and "[g]ray rag around my neck." The lyrics also indicate concern with disrespect, with lines such as "you whoopin' at me" and "y'all act like y'all some wiseguys." The song also uses the word "n[***]a" throughout.

Although the prosecutor said beforehand that the song "becomes pretty indecipherable pretty fast," he asked Detective Nance if there was any "gang significance" in the song. "There is quite a bit of gang significance in that song," replied Detective Nance. The prosecution asked if a particular lyric heard in the song "is describing what happens to its enemies." Hin's attorney

objected on speculation grounds, which the court sustained. Rephrasing his questions, the prosecutor asked if, based on the lyrics heard by the jury and the fact that the lyrics are "followed by gunfire," the song "appears to be more than just music to the gang." Detective Nance opined that "[i]t's very much so more than music to the gang. . . . You hear a lifestyle being portrayed. You hear people that are angry because people are disrespecting or messing with them or fucking with them as they say." Hin's attorney objected again, arguing that Detective Nance "testifying as to what the words are is improper." The court overruled the objection, saying that she could testify to the significance of the music as they awaited a transcript.

The prosecution asked Detective Nance if there were "gang phrases that [she] heard coming out from that song." Detective Nance opined that the song's references to "apples," including "straight-up apple murderer," is a "gang phrase for TRG" that is "for anybody that's enemies with ABZ . . . . That's a disrespectful term or slang term that's been used to describe ABZ by TRG gang members." "Slicing up apples," according to Detective Nance, referred to "shooting, to killing, to hurting, to eliminating the enemy, which would, in that case, be ABZ." Detective Nance also testified that the references to "n[***]a" throughout the song was the TRG "mimicking the African American slang" and that "Southeast Asian gang members, such as TRG, refer to each other by that term . . . frequently both in music, on the street and in talk just with each other."

When asked by the prosecution if gangs such as TRG used songs like "Bang, Bang" for more than just entertainment, Nance opined that the song also served an instructional function: "This song, when you listen to it and other songs like this, they're describing the lifestyle the gang members live.

They are describing the shootings, what to do after the shootings, why you do the shootings, the disrespect that happens and what's going to happen to other gang members if they disrespect the Tiny Rascal Gang. It's very — shows their lifestyle. If you listen to the words, as hard as they are to hear sometimes, you can hear all the things that they live by, their rules, their ethics. They talk about getting caught, getting caught slipping, getting disrespected . . . all the things that we've already talked about that lead to violent acts are listed in that song. It's like a guidebook for the gang members' rights, rules they live by and ways they carry out and commit their crimes." "They're motivational, if that's the lifestyle you live."

The prosecution used the CD and the song as proof of Hin's gang membership throughout its guilt phase closing argument. The prosecutor reminded the jury of the items found in Hin's residence: the ".22 ammo[,] . . . the .12 gauge shotgun shell, the TRG roll of film strips . . . and the Crip killer CD that we found in this CD case, containing the song, 'Bang, Bang, you are F-ing with the TRG gang,' like we heard during these proceedings." The prosecution argued that the CD, along with Hin "not just identifying himself as a rascal, but by the writings on the CD, the handwritten writings as in fact a Crip killer," helped demonstrate "quite easily . . . that Mao Hin's membership in the TRG gang wasn't something new or spontaneous."

At oral argument, the Attorney General emphasized that the song's purpose was to "prove up [Hin]'s gang membership" and was not "presented for its truth." But the record shows that the prosecution's closing argument pointed to the CD as proof of Hin's intent to kill. The prosecutor argued, in reference to the American Legion Park shooting, that even "[i]f some of you believe [Hin] was, in fact, the aider and abettor to a murder," as

opposed to the actual killer, "the intent to kill is shown through the CD's, through his description, through his other activities." As to the Bedlow Drive shootings, the prosecution argued, "Mao Hin described himself as a Crip killer on his CD cover, remember, with the writing that we saw there. These were the individuals who decided to carry that out. We also have the transcript of the CD . . . remember the song Bang Bang? You are f'ing with the TRG gang. What's that talking about? Find your enemies, shooting them. This is the intent to kill."

In his closing summation, the prosecutor argued that the CD was proof of how "we . . . know that [Hin] [wa]s an active participant of the Bedlow Drive [shooting]" because it was "[j]ust like the music, just like the lyrics in the CD predicted." The prosecutor further argued, as to the American Legion Park shooting, that "you see the intent to kill as he expressed on the CD, the [crip] killer writing that we have right there on the bottom [of the CD], and we see that he can't even use the letter C in Rascal [*sic*] without crossing it out. We see the gang mentality that . . . you take care of your threats. That you don't leave any threats unanswered."

On the first full day of guilt deliberations, the jury relayed a note to the court "asking for a transcript of the TRG 'Bang, Bang' song." Hin's attorney objected to providing the transcript because "we didn't introduce it." The court overruled the objection, stating that "[y]ou don't have to actually introduce a transcript" because "I think we have to have one anyway. So I'll give them a transcript on that." A transcript of the lyrics to "Bang, Bang" was introduced and admitted into evidence.

91

### b. *Penalty Phase*

The prosecution also used the CD and song as evidence during the penalty phase of the trial. The prosecution displayed the CD and referenced the "Bang, Bang" track in the slide show that accompanied its penalty argument and was presented to the jury. A slide exhibited a photograph of the CD case and the CD under the header, "TRG BANG BANG."

Toward the close of the evidentiary portion of the penalty phase, the prosecutor asked the court for leave to "play the 'Bang, Bang' song once more." The prosecutor acknowledged that the court had previously "prohibit[ed] [him] from using the 'Bang, Bang' CD more than once in the guilt phase." When asked why he wanted to play it, the prosecutor stated, "[i]t's got a good beat to it." The court responded, "[a]nd you can dance. Well, it's in evidence. Sure."

In his closing summation during the penalty phase, the prosecutor directed the jury to "Bang, Bang" as evidence of Hin's "[m]otive, intent and opportunity." "[W]e don't just have to hear it from me," argued the prosecutor, "we can hear from the defendant in his own song, in the gang's own song about what his intent was, about their membership, about their activities, about their crimes, the guns and the violence." He then played the "Bang, Bang" song again for the jury. After the song was played, the prosecution made the case for the death penalty: "It becomes quite clear that Mao Hin had a war against society and against everybody in it when we look at all the circumstances. When we see that his crimes involve, at a very minimum, 47 different shots that were fired at the five different shootings. . . . [W]e see that there were 25 unarmed victims that were . . . shot at . . . . We see the war on society when eight individuals are . . . seriously wounded enough to go to a hospital and . . . two

innocent, unarmed victims . . . being killed on his war on society. . . . So we come back to this again. Does Mao Hin, given who he is and what he's done, really deserve anything less than what he . . . inflicted upon his victims and the answer is of course not . . . . What is the appropriate punishment? Death. Only death."

### 2. *Analysis*

Evidence Code section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review rulings on the admissibility of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 723.) Although this standard is deferential, we will reverse trial court admissibility determinations if the probative value of the evidence " 'clearly is outweighed by [its] prejudicial effect.' " (*People v. Scheid* (1997) 16 Cal.4th 1, 18.)

Courts must " 'carefully scrutinize[]' " the admission of evidence of a defendant's gang membership because it " 'creates a risk the jury will improperly infer the defendant has a criminal disposition' " and is therefore guilty of the offense charged. (*People v. Mendez* (2019) 7 Cal.5th 680, 691, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1194; accord, *People v. Williams*, *supra*, 16 Cal.4th at p. 193 [noting the potentially "highly inflammatory" impact of such evidence on juries].) Evidence of a defendant's character or criminal disposition is inadmissible to prove he or she committed a specific criminal act. (Evid. Code, § 1101, subd. (a).) To guard against the prejudicial effect of gang

evidence, the Legislature recently enacted Penal Code section 1109, which requires courts to try gang enhancements separately from the underlying offense upon a defendant's request. (Stats. 2021, ch. 699, § 2, subd. (f).) When considering gang-related rap music specifically, courts have found that its prejudicial effect corresponds to the "nature of [its] violent, inflammatory lyrics." (*People v. Coneal* (2019) 41 Cal.App.5th 951, 954 (*Coneal*); see also *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35 [holding that rap songs were not "unduly prejudicial" because "[t]he language and substance of the lyrics, although graphic, did not rise to the level of evoking an emotional bias against defendant as an individual"].) Other commentators have noted that the introduction of rap lyrics into evidence "invokes racist stereotypes about the inherent criminality of young black and Latino men" and injects racial bias into jury decisionmaking. (Nielson & Dennis, Rap on Trial: Race, Lyrics, and Guilt in America (2019) pp. 17–18 [discussing social science studies].) These racial stereotypes can be leveraged equally against Southeast Asian defendants like Hin, who are subject to "colorist and anti-Black imaginations that associate darker skin with criminality." (Magsaysay, *Asian Americans and Pacific Islanders and the Prison Industrial Complex* (2021) 26 Mich. J. Race & L. 443, 494; see *id.* at p. 495 [explaining that racial stereotypes surrounding Southeast Asian and Pacific Islanders are "constructed in relation to dehumanizing, racist, and classist ideations of Blackness"].)

When evaluating the admission of rap music, courts have recognized it has "minimal probative value" to the extent that it "depend[s] on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so." (*Coneal, supra,* 41 Cal.App.5th at p. 953; see *U.S. v. Williams* (D.Ariz. 2023)

94

663 F.Supp.3d 1085, 1133 [the probative value of rap music is "difficult to identify" because it "features fictional imagery, metaphors, and exaggerated storylines"].)  We have observed that " '[r]easonable persons understand musical lyrics . . . as the figurative expressions which they are,' which means they 'are not intended to be and should not be read literally on their face . . . .' "  (*In re George T.* (2004) 33 Cal.4th 620, 636, quoting *McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989.)  Sometimes words are "merely rap lyrics."  (*People v. Melendez* (2016) 2 Cal.5th 1, 24 (*Melendez*).)  For example, "[f]ew would argue that Bob Marley actually 'shot the sheriff,' or that Johnny Cash really 'shot a man in Reno just to watch him die.' "  (Alexander, *Chopped & Screwed: Hip Hop From Cultural Expression to a Means of Criminal Enforcement* (2021) 12 Harv. J. Sports & Ent. L. 211, 231–232, fn. omitted.)

We have also held that the relevance of rap lyrics is further diminished when they "lack[] foundation."  (*Melendez, supra*, 2 Cal.5th at p. 23.)  These foundational components include whether the defendant authored the lyrics.  (*Ibid*.; see also *U.S. v. Gamory* (11th Cir. 2011) 635 F.3d 480, 493 [holding that the probative value of a rap video was "minimal at best" when there was no evidence that the defendant was in the video or authored the lyrics].)  Thus, "[a]bsent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal."  (*Coneal, supra*, 41 Cal.App.5th at p. 968.)

In *Coneal*, the Court of Appeal held that the trial court abused its discretion under Evidence Code section 352 when it admitted into evidence five gang rap music videos.  (*Coneal, supra*, 41 Cal.App.5th at p. 965.)  The *Coneal* court observed

95

that although expert testimony established that "[g]ang members rap about 'real-life events,' including real-life individuals who have been murdered," the testimony also acknowledged that "rap lyrics can also describe made up or inflated events." (*Id.* at p. 961; see *id.* at p. 968.) The court further reasoned that the videos were made before the crime was committed, the defendant did "not appear or sing in" some of them, and the prosecution's expert failed to differentiate which rap lyrics depicted real events versus fictitious ones. (*Id.* at p. 961; see *id.* at pp. 959–962, 968.) Thus, the court found that the rap lyrics had minimal probative value in establishing that the gang in question committed the crimes rapped about or that the defendant "had or intended to kill rival gang members." (*Id.* at p. 970.) The court further found that to the extent that the prosecution introduced the videos to prove the defendant's gang membership, they were cumulative of less prejudicial evidence, including screenshots of the rap videos, other photographs of the defendant making gang signs and associating with gang members, and gang expert testimony about the gang's rivalry with other gangs. (*Id.* at pp. 966–967.)

Regarding prejudicial effect, the *Coneal* court observed that the rap lyrics "casually describe[d] graphic, widespread violence" that "paint[ed] a picture of appellant and his fellow gang members as eagerly and ruthlessly seeking out and engaging in violence, with no empathy for their victims." (*Coneal*, *supra*, 41 Cal.App.5th. at pp. 970–971.) The videos thus posed "a significant danger that the jury will use it as evidence of appellant's violent character and criminal propensity." (*Id.* at p. 971; see *ibid.* ["some of the purposes advanced by the People — the rap videos prove appellant 'embraced the gang lifestyle' and was 'a violent Taliban

soldier' — skirt dangerously close to advocating the use of the videos as evidence of appellant's violent character"].) The court further noted that the songs contained "misogynistic lyrics" that "had no probative value yet were highly inflammatory." (*Ibid.*)

The *Coneal* court concluded that the probative value of the lyrics was substantially outweighed by their prejudicial effect under Evidence Code section 352. (*Coneal*, *supra*, 41 Cal.App.5th at p. 972.) The court reasoned that "where the rap lyrics are cumulative of other evidence, like screenshots, or where the probative value rests on construing the lyrics literally without a persuasive basis to do so, the probative value will often be 'substantially outweighed by [the] prejudicial effect.'" (*Id.* at pp. 971–972.) The court explained that rap lyrics may be probative "where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime," or where there is "sufficient corroboration from other evidence." (*Id.* at p. 969.) The Legislature codified much of *Coneal*'s reasoning when it enacted Evidence Code section 352.2 in 2022. (Stats. 2022, ch. 973, § 2, adding Evid. Code, § 352.2, subd. (a); see Judicial Council of Cal., Summary of Court-Related Legislation (Dec. 2022) p. 58, appen. C [summarizing Assem. Bill No. 2799 (2021–2022 Reg. Sess.) as "essentially codifying the holding" in *Coneal*].)

We hold that the admission of the song "Bang, Bang" was an abuse of discretion under Evidence Code section 352. As noted, the prosecution used the song "Bang, Bang" in the guilt and penalty phases as evidence of Hin's gang membership and introduced the lyrics for their truth as evidence of his intent and motivation to kill during the Bedlow Drive and American Legion Park shootings. But the prosecution did not argue or introduce

any evidence to show that Hin was involved in the creation or production of the song or that it described any of the charged crimes. Indeed, there is no evidence that Hin authored the song, wrote the lyrics, was involved in its production, or even that he listened to it. As the Attorney General concedes, the only connection between Hin and the contents of the song is "the fact that [Hin] possessed the CD." The lack of evidence of Hin's authorship distinguishes this case from others where courts have upheld the admission of rap lyrics under Evidence Code section 352. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372 [upholding the admission of handwritten rap lyrics found during a search of a defendant's home]; *People v. Zepeda*, *supra*, 167 Cal.App.4th at p. 32 [upholding admission of rap songs where defendant wrote the lyrics].) For the same reason, these lyrics were less probative than those in *Coneal* and those we found reasonably excluded in *Melendez*. (See *Melendez*, *supra*, 2 Cal.5th at pp. 21–24 [holding exclusion of handwritten rap lyrics with substantial factual similarity to charged offense found in codefendant's cell was not an abuse of discretion]; *Coneal*, *supra*, 41 Cal.App.5th at pp. 968–970.)

Although the Attorney General argues that the song was introduced only for the purpose of proving Hin's gang membership, that is belied by the record showing how the prosecution sought to use the song. But even assuming the rap lyrics were introduced only to prove Hin's gang membership, as in *Coneal*, the evidence was cumulative of less prejudicial evidence. (*Coneal*, *supra*, 41 Cal.App.5th at pp. 966–967.) The trial court admitted extensive evidence of Hin's membership in TRG, including dozens of photographs of him making gang signs, wearing TRG colors, and associating with other gang members, sometimes displaying handguns. It also included

98

Detective Nance's expert testimony about his active membership. Moreover, a photograph of the CD with Hin's alleged writing on it could have been admitted without playing a song from the album. Without any evidence that Hin wrote, sang, produced, or even listened to the song "Bang, Bang," it had no probative value to prove his membership in TRG beyond the fact that he possessed a CD that included the song, a fact that could have been established without introducing the song's lyrics.

Weighing against the minimal probative value of the song was the danger of its undue prejudicial effect. The lyrics are graphic and violent, repeatedly describing "blast[ing]," "killing," "murder[ing]" TRG gang rivals, so-called "apples." The lyrics also include inflammatory and irrelevant descriptions of sexualized violence. The exchange between the prosecutor and Detective Nance over the lyrics' inclusion of the word "n***a" appeared designed to evoke anti-Black biases by highlighting the "mimic[ry]" of "African American" gangs by Hin's Southeast Asian gang. (See *People v. Bell* (2019) 7 Cal.5th 70, 105 (*Bell*) [" ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of jurors' emotional reaction." ' "].) It is precisely because of the risk of injecting racial bias into the jury's decisionmaking that the Legislature passed Evidence Code section 352.2; as noted in the comments to the Assembly floor analysis, "rap lyrics and other creative expressions get used as 'racialized character evidence: details or personal traits prosecutors use in insidious ways playing up racial stereotypes to imply guilt.' " (Assem. Conc. Sen. Amends. to Assem. Bill

No. 2799 (2021–2022 Reg. Sess.) as amended Aug. 9, 2022, p. 2, quoting Lee, *This Rap Song Helped Sentence a 17-Year-Old to Prison for Life*, N.Y. Times (Mar. 30, 2022).)

Moreover, the prosecution's use of the song appeared to "skirt dangerously close to advocating the use of the videos as evidence of appellant's violent character." (*Coneal*, *supra*, 41 Cal.App.5th at p. 971.) Detective Nance testified that the lyrics were evidence of TRG gang members' "lifestyle" and that the song served as a "guidebook" for the gang, providing "rules they live by and ways they carry out and commit their crimes." During closing, the prosecution argued that the lyrics "Bang Bang, you are f'ing with the TRG gang" meant "[f]ind your enemies, shooting them." He also argued that the CD was evidence of Hin's "gang mentality" that "you don't leave any threats unanswered." The risk of this prejudicial effect — that " 'the jury will improperly infer the defendant has a criminal disposition' " and is therefore guilty of the offense charged — is why we have long held that gang evidence must be carefully scrutinized. (*People v. Mendez*, *supra*, 7 Cal.5th at p. 691, quoting *People v. Carter*, *supra*, 30 Cal.4th at p. 1194; accord, *People v. Williams*, *supra*, 16 Cal.4th at p. 193.) Because the probative value of the rap song was minimal, cumulative of other gang-membership evidence, and substantially outweighed by the risk of undue prejudice, we hold that the trial court abused its discretion in admitting "Bang, Bang" at Hin's guilt phase trial.

We further hold that the trial court abused its discretion in allowing the prosecution to play the song "Bang, Bang" again for the jury during the penalty phase. As noted, the prosecutor introduced the song by saying, "Motive, intent and opportunity, but we don't just have to hear from me, we can hear from the

defendant in his own song, in the gang's own song about what his intent was, about their membership, about their activities, about their crimes, the guns and the violence." Immediately after playing the song, the prosecutor closed with his final case for death: "It becomes quite clear that Mao Hin had a war against society and against everybody in it when we look at all the circumstances."

Although trial courts have " 'much narrower' " discretion to exclude evidence under Evidence Code section 352 at the penalty stage, we have said this in the context of "evidence showing circumstances of the crime." (*Bell*, *supra*, 7 Cal.5th at pp. 106, 105.) " 'This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences,' " and " 'because the risk of an improper guilt finding based on visceral reactions is no longer present.' " (*Id.* at p. 106, quoting *People v. Bonilla* (2007) 41 Cal.4th 313, 353–354.) Here, the rap lyrics had minimal probative value as to Hin's gang membership and do not bear any relation to the circumstances of the charge in a sense akin to the surveillance tape at issue in *Bell* (*Bell*, at pp. 105–106) or the crime scene photographs in *Bonilla* (*Bonilla*, at pp. 353–354).

It is also true that at the penalty phase, " 'the prosecution is entitled to place the capital offense *and the offender* in a morally bad light.' " (*Bell*, *supra*, 7 Cal.5th at p. 106, italics added.) But there are limits: Again, there was no foundation for introducing the song into evidence, as the prosecution offered nothing to show that Hin authored, produced, sang, or even listened to the song. Moreover, the racial connotations of introducing rap lyrics to prove intent and moral character created a serious risk that the jury's penalty-phase deliberations would be influenced by racial bias. We conclude that the risk of

undue prejudice substantially outweighed the song's probative value at the penalty phase as well.

### 3. Prejudice

Hin asserts that the prosecutor's use of the "Bang, Bang" lyrics rendered his trial fundamentally unfair in violation of his due process rights under the state and federal Constitutions. Alternatively, he asserts that the error in admitting the lyrics prejudiced both his guilt-phase and penalty phase verdicts. Specifically, he argues that his intent at the American Legion Park shooting was closely contested at trial, that the prosecutor relied on the CD and song during closing argument to fill an evidentiary gap as to his intent, and that the jury's note during deliberations asking for the transcript of the song suggests that the jury relied on the song in convicting him of murder, attempted murder, and the gang-murder special circumstance. He further argues that his intent to kill was contested at the penalty phase and that the prosecution's reliance on the song in closing was prejudicial.

Although the trial court abused its discretion in admitting the "Bang, Bang" song, we hold that the error did not constitute a due process violation that rendered his trial fundamentally unfair, nor is there a reasonable probability of a different outcome at the guilt or penalty phase absent the error. (See *People v. Watson, supra,* 46 Cal.2d at p. 836; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

As discussed, the jury heard ample evidence supporting an inference that Hin intended to kill Martinez and Pizano in American Legion Park, including most importantly eyewitness testimony from Pizano. Pizano testified that Hin gave all the directions to Martinez and Pizano during the robbery, forced

them to walk to a darker area of the park, and whispered to Kak just prior to the shooting. Given this evidence, it is not reasonably probable that without the introduction of the song, the jury would not have convicted Hin of the murder of Martinez or attempted murder of Pizano.

Likewise, as to the gang-related offenses, there was ample evidence of Hin's membership in TRG and role in the Bedlow Drive shooting. As noted, the gang evidence included numerous photographs of Hin with other TRG members, making TRG hand signs, and wearing gang colors, as well as expert testimony regarding his membership. Furthermore, in addition to his own confession of involvement in the Bedlow Drive shooting, ballistics evidence linked Hin's van to the crime, and a witness testified that on the night of the shooting, Hin gave him the gun at a party for safekeeping.

We further conclude that the admission of the song "Bang, Bang" during the penalty phase closing argument was harmless in light of the substantial evidence in aggravation that the jury heard. The jury heard evidence of Hin's involvement in multiple uncharged violent offenses, including the Hammer Lane shooting, and two other gang-related shootings. This included testimony from a witness to an uncharged shooting who saw Hin fire the gun, and forensic evidence linking the shells and casings from the uncharged shootings to the American Legion Park and Bedlow Drive Shootings. The jury also heard extensive victim-impact testimony from Pizano describing the trauma she endured and from members of Martinez's family including his parents, siblings, and best friend.

### E. Expert Testimony as Circumstantial Evidence

Hin claims the trial court erred by failing to sua sponte instruct the jury that the court's general instructions on circumstantial evidence applied specifically to expert testimony. Hin forfeited the claim by failing to request such an instruction below; the claim is also meritless.

The trial court provided the jury with the standard definition in CALJIC No. 2.00 of direct and circumstantial evidence and further instructed pursuant to CALJIC No. 2.02 that "if the evidence as to any specific intent or mental state permits two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to its absence, you must adopt that interpretation which points to its absence." The court also provided standard instructions regarding the proper consideration of expert testimony. Notwithstanding these other instructions, Hin argues the trial court should have sua sponte instructed the jury that "expert testimony is a form of circumstantial evidence and if expert testimony permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt."

We have explained, "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) Hin did not object to the instruction as given or ask the court to add the language he now claims was

required. Having failed to do so below, we conclude that Hin's claim was forfeited.

Even if Hin's claim was preserved for review, we find it lacks merit. Hin "cites no authority for the proposition that a trial court is required to specify the evidence or the issues to which the instructions regarding circumstantial evidence apply." (*Landry, supra*, 2 Cal.5th at p. 100.) This omission is logical because "how a general instruction applies to specific evidence or theories is an argument for counsel to make." (*Ibid.*)

### F. Firearm Expert Testimony

The prosecutor called Duane Lovaas, a firearm expert from California's Department of Justice, to testify about evidence recovered from the American Legion Park shooting. Lovaas offered his opinion that the nine-millimeter shell casings found in the park near Martinez's body, along with a bullet fragment removed from Martinez's chest, were fired from the Beretta. He further testified that a second bullet fragment recovered from Martinez's thigh was too small to analyze and that he "couldn't say anything about the firearm it came from." The following exchange then took place: "[PROSECUTOR:] So there was in fact a possibility that the shot to the thigh could have came [*sic*] from a different firearm? [¶] [LOVAAS:] It's possible, but — [¶] [PROSECUTOR:] It could have even came [*sic*] from a revolver that wouldn't have ejected shell casings; is that correct?"

Defense counsel objected that the question called for speculation, and the court sustained the objection. The prosecutor then asked, "Based upon your training and experience, though, a revolver could have been used; is that correct?" Defense counsel again objected that the question

called for speculation, but the court overruled the objection. Lovaas then responded, "Well, a second firearm could have been used, could have been a revolver." After Lovaas explained that a revolver would not eject shell casings, the prosecutor asked, "So based upon your training and experience, you cannot say whether or not one or two guns were used based upon the physical evidence that you were presented with regards to that case?" Lovaas responded, "That's correct."

On cross-examination, Lovaas acknowledged that "if [he has] a fragment [he] can't identify, [the fragment is] possibly from the same gun." He continued, "If there is no evidence of another gun where I can identify something to that second gun, I really got no evidence of a second gun. So a fragment that doesn't match something I've got doesn't necessarily imply a second gun."

On appeal, Hin renews his objection to Lovaas's testimony. We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) Expert testimony must be based upon the facts shown by the evidence and may not be based " ' "on assumptions of fact without evidentiary support" ' " or " ' "on speculative or conjectural factors." ' " (*People v. Vang*, *supra*, 52 Cal.4th at p. 1046.) We conclude there was no abuse of discretion in permitting the prosecutor to ask whether an unidentified bullet fragment could have come from a second weapon.

Even assuming the trial court erred, any error was harmless. Hin admitted to his involvement in Martinez's murder at American Legion Park and was identified by Pizano. In addition, Hin was linked to the nine-millimeter Beretta at the

time of his arrest following the Bedlow Drive shooting. In any event, Lovaas's testimony on this point was properly equivocal, and the prosecutor's subsequent argument was limited to the theory that Kak was the only shooter at American Legion Park.

## G. Unanimity Instruction

The trial court instructed the jury on two theories of first degree murder: willful, deliberate and premeditated murder, and felony murder predicated on robbery and kidnapping. The trial court further instructed that if the jury found that the defendant committed an unlawful killing, it had to agree unanimously whether the offense was first degree murder or second degree murder. The trial court did not require the jury to agree unanimously on whether Hin had committed premeditated murder or felony murder. Hin claims the court's failure to do so violated his rights to proof beyond a reasonable doubt of all elements of the crime of conviction, a unanimous jury verdict, and a fair and reliable determination that he committed a capital offense.

Hin did not object to the lack of a unanimity instruction. Nevertheless, we have previously concluded this claim affects a defendant's substantial rights and therefore may be raised on appeal. (See, e.g., *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 646.) But Hin acknowledges that we have repeatedly rejected this claim (see, e.g., *People v. Brooks* (2017) 3 Cal.5th 1, 82) and presents no persuasive grounds to reconsider our precedent.

## H. Constitutionality of Aider and Abettor Capital Liability

In light of our holding that the gang-murder special circumstance must be reversed, we are left with two special

circumstances: robbery murder and kidnapping murder. (§ 190.2, subd. (a)(17)(A), (B).) As to both of these felony-murder special circumstances, the court instructed that the jury could find true the special circumstance if the defendant acted "with reckless indifference to human life and as a major participant" in aiding and abetting "robbery or kidnapping which resulted in the death of a human being, namely Alfonso Martinez." (See CALJIC No. 8.80.1.) While recognizing that this court has rejected similar arguments in the past, Hin nonetheless contends that jury instructions permitting the death penalty on the basis of felony murder as an aider and abettor are arbitrary, overbroad, and disproportionate in violation of international law and his due process and Eighth Amendment rights and the parallel provisions of the California Constitution.

In *Enmund v. Florida* (1982) 458 U.S. 782, 797, the United States Supreme Court held that the Eighth Amendment prohibited imposition of the death penalty on an aider and abettor to capital murder who did not "kill, attempt to kill, or intend [to kill]." In *Tison*, the court clarified that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison, supra*, 481 U.S. at p. 158.) That requirement has been incorporated into section 190.2, subdivision (d). The jury here specifically found that Hin was a major participant in the robbery and kidnapping that gave rise to the special circumstances for robbery murder and kidnapping murder, respectively, thereby satisfying the standard set forth in *Tison*.

While acknowledging this latter point, Hin makes two distinct claims under the Eighth Amendment. First, he argues

that California's felony-murder special circumstance is overbroad and fails to satisfy the Eighth Amendment's narrowing requirements for death eligibility set forth in *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246. In Hin's view, *Tison* was concerned solely with the selection phase of the capital case and whether the aggravating factors required under Arizona law were sufficient to satisfy the Eighth Amendment at that stage of the proceedings. Second, Hin argues that imposing a death sentence on an aider and abettor to felony murder who does not kill or harm the victim is disproportionate under the current three-part test used by the United States Supreme Court in analyzing claims that a death sentence violates the Eighth Amendment. He notes that *Tison* pre-dates the establishment of what he describes as a three-part test applied in *Roper v. Simons* (2005) 543 U.S. 551, *Atkins v. Virginia* (2002) 536 U.S. 304, and *Kennedy v. Louisiana* (2008) 554 U.S. 407. Under that test as described by Hin, the court considers (1) "objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions" (*Roper*, at p. 563); (2) whether retribution or deterrence justifies capital punishment for the particular crime; and (3) whether imposition of the death penalty in that context is consistent with international law.

Hin acknowledges that we have rejected challenges to the felony-murder special circumstance but urges us to reconsider those decisions. As discussed, Senate Bill 1437 heightened the requirements for death-eligible felony-murder culpability to conform with our case law (see *Banks*, *supra*, 61 Cal.4th 788; *Clark*, *supra*, 63 Cal.4th 522) and the Eighth Amendment's requirements. (See *Strong*, *supra*, 13 Cal.5th at pp. 704–707.) Hin provides no persuasive reason to reconsider those decisions.

In addition, Hin's briefing states, without elaboration and without mention of our decisions in *Banks* and *Clark*, an independent claim under the state constitution's prohibition against "cruel or unusual punishment." (Cal. Const., art. I, § 17.) In the absence of any developed legal analysis, we express no view as to whether a claim brought under the state Constitution would require a different result than under Eighth Amendment principles.

## IV. PENALTY PHASE ISSUES

### A. Evidence of Uncharged Crimes

The prosecution presented evidence of four uncharged offenses as evidence of the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" (§ 190.3, factor (b)): the Hammer Lane shooting offered at the guilt phase as a predicate crime to the gang special circumstance and enhancements; an October 18, 2003 shooting on Comstock Drive; an October 31, 2003 shooting at the Manchester Arms apartments; and a May 7, 2003 battery of the assistant manager of the Manchester Arms apartments. The prosecutor also recalled his guilt-phase criminal street gang expert to offer her opinion that all three incidents were gang-related, and that Hin was a leader in the TRG based on the evidence of his role in the shooting and battery at the Manchester Arms apartments. The trial court granted Hin's motion to strike the expert's opinion that Hin was a leader in the gang, but it otherwise denied his motion to exclude this evidence.

Hin contends the court erred in admitting evidence of the uncharged drive-by shooting on Comstock Drive and by refusing

to strike the gang expert testimony in its entirety.  We address each claim in turn.

### 1.  Comstock Drive Shooting

#### a.  Facts

Before the penalty phase began, Hin moved to exclude evidence that he participated in a drive-by shooting on Comstock Drive committed eight days after the American Legion Park shooting.  He argued that because there was insufficient evidence linking him to the incident, the evidence was not relevant (Evid. Code, § 210) and was more prejudicial than probative (*id.*, § 352).  Following a hearing on the motion, the trial court ruled the evidence was admissible.  The trial court explained that while the evidence was circumstantial, there was enough for the jury to decide that Hin either was the shooter or aided and abetted the shooting.  Accordingly, the jury heard the following evidence during the penalty phase:

Saran Toung was on the driveway of his residence on Comstock Drive on October 18, 2003 with his brother-in-law, Salvador Ayson, when he saw a van coming and heard gunshots.  He believed the gunshots came from the passenger side of the van.  He testified that it was a minivan, but he could not remember the make or color of the van.  When presented with a picture of Hin's van, Toung was unsure whether it was the van he saw the night of the shooting.

Ayson testified that after the shooting he ran inside to tell Toung's brother what had happened.  Ayson told him that the shots came from a gold or sandstone minivan.  When asked by the prosecutor, Ayson could not identify the make of the minivan.  When shown a picture of Hin's vehicle, Ayson said it

was a similar color and "could have been" the vehicle involved in the shooting, but that it was hard to say.

Two days after the shooting, Tuong's brother approached a police officer in the neighborhood and told him about the shooting. According to the officer, the brother learned of the shooting when Ayson and Toung woke him up and told him about shots fired at the house from a gold or sandstone-colored Toyota Previa minivan. The brother showed the officer bullet holes in the garage and a flat tire on a vehicle parked in the driveway. The officer's partner, Officer Graviette, recovered two shell casings from a red toolbox in the garage. Those shell cases were later matched to the same nine-millimeter Beretta that had been linked to the other crimes involving Hin. The ammunition was also the same brand as the ammunition used at American Legion Park.

Prior to deliberations, the jury was instructed that a juror must find beyond a reasonable doubt that Hin committed the criminal acts or activities introduced by the prosecutor, including the shooting on Comstock Drive, before that juror could consider that activity as aggravating evidence.

### b. Analysis

Section 190.3, factor (b) allows the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." "Evidence of a defendant's unadjudicated violent criminal activity may be admitted for the jury's consideration if there is substantial evidence to prove each element of the unadjudicated activity." (*People v. Masters* (2016) 62 Cal.4th 1019, 1072.) "We review a trial court's decision to admit evidence of other crimes for abuse

of discretion, ' "and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." ' " (*People v. Johnson* (2019) 8 Cal.5th 475, 515.) "Evidence meeting this standard satisfies constitutional due process and reliability concerns." (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)

Even assuming the trial court abused its discretion in admitting the evidence of the Comstock Drive shooting — either because the evidence was insufficient or because it was more prejudicial than probative — any error was harmless. When the trial court errs in admitting evidence of uncharged crimes, "as for other errors at the penalty phase, we ask whether there is a reasonable possibility that the error affected the verdict, a standard essentially the same as the harmless beyond a reasonable doubt standard." (*People v. Penunuri* (2018) 5 Cal.5th 126, 169.) This standard has not been met. The Comstock Drive incident, in which there were no injuries, is much less significant than the prosecutor's primary evidence in aggravation: the charged crimes, the evidence of uncharged crimes on Hammer Lane and at the Manchester Arms apartments (the admission of which Hin does not challenge), and the victim impact testimony. Indeed, the prosecutor made only passing references to the uncharged incident in closing argument. We find no reasonable possibility that evidence of the Comstock Drive shooting affected the verdict.

### 2. Gang Expert Testimony

#### a. Facts

Before trial, the prosecutor filed a "Notice of Factors in Aggravation" listing the dates and Penal Code sections for nine crimes for which he planned to introduce evidence in

aggravation pursuant to section 190.3, factor (b). The notice stated that the prosecutor intended "to call witnesses relating to all of the above mentioned felony conviction(s) and other criminal acts," "evidence of the circumstances of the crime and special circumstances," and "victim impact evidence as permitted by law." After trial commenced, the prosecutor filed a second "Notice of Factors in Aggravation" stating that he would seek to present evidence relating to three additional incidents. Neither notice specifically referred to gang-related offenses or enhancements.

Following the testimony of the lay witnesses to these events, the prosecutor recalled the guilt phase gang expert, Detective Nance. She testified that a member of a rival gang to the TRG lived next door to where the Comstock Drive shooting occurred. Detective Nance noted that the rivalry between the two gangs was the impetus for "several shootings" and other "acts of violence." She also testified that the victims in the October shooting at Manchester Arms apartments were members of another rival gang and that if Hin was involved in that incident, it would further her opinion that he was an active participant in the TRG gang during the timeframe when the crimes in American Legion Park were committed. She further testified that Hin's participation in the May attack at the Manchester Arms apartments could be considered gang-related and would help establish Hin's membership in the TRG gang.

Following the detective's testimony, Hin objected that the prosecutor's notice of evidence in aggravation did not allege gang enhancements for any of the section 190.3, factor (b) offenses and that the expert testimony was otherwise inadmissible. The prosecutor countered that the testimony was

relevant to motive and identity, as well as Hin's level of culpability as a leader rather than merely a follower. The court ruled the testimony to be generally admissible with respect to motive and identity for the uncharged crimes, but the court struck the testimony about Hin being a leader in the TRG.

Hin claims that the trial court abused its discretion by refusing to strike all of the gang expert's testimony presented during the penalty phase, renewing his arguments below that the testimony was offered without sufficient notice and was inadmissible to identify Hin as the perpetrator of the uncharged criminal acts.

### b. *Analysis*

The prosecution must give notice of the aggravating evidence it plans to offer "within a reasonable period of time as determined by the court, prior to trial." (§ 190.3.) "[U]nlike a criminal charging document, which must allege with sufficient specificity particular *offenses* (§ 952), the notice required under [section 190.3], factor (b) is notification of the *evidence* to be introduced (§ 190.3)." (*People v. Rundle* (2008) 43 Cal.4th 76, 183, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Notice of factor (b) evidence 'is sufficient if the defendant has a reasonable opportunity to respond.' " (*Rundle*, at p. 183.)

Hin does not argue that the prosecutor failed to give proper notice of each incident, but rather that he had no notice that the prosecutor's evidence would include gang expert testimony. But such specificity is not required. As we have explained, " 'A capital defendant is entitled to notice of other violent crimes or prior felony convictions offered in the prosecution's penalty case-in-chief' " but " 'the prosecutor is not

prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein.' " (*People v. Hart* (1999) 20 Cal.4th 546, 639 (*Hart*).)

"The purpose of the notice required by section 190.3 is to advise the accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty phase." (*Hart*, *supra*, 20 Cal.4th at p. 639.) Here, Hin was specifically apprised as to each incident of criminal activity offered by the prosecutor, and his alleged involvement with the TRG and the gang's various rivalries permeated the guilt phase of the trial. The gang aspect of the unadjudicated offenses was referenced by both defense counsel and the prosecutor during the hearing on Hin's motion to exclude certain section 190.3 factor (b) allegations. Most relevant was the prosecutor's theory that the motive for the Comstock Drive shooting was a case of mistaken identity for a member of the "Loc Town Crips," whom the prosecutor described as "rivals of [Hin's] gang at that time." And when the prosecutor did call his gang expert, Hin raised no objection until after the prosecutor's direct examination as well as his own cross-examination of that witness.

Hin further argues that the trial court erred in denying his motion to strike because expert testimony is inadmissible to establish the identity of the perpetrator of a crime. Hin relies on the general proposition that a gang expert may "respond to hypothetical questions" "based on the evidence" but, like any expert, may not offer an opinion of guilt or innocence. (*People v. Vang, supra*, 52 Cal.4th at p. 1041; see *id.* at p. 1048.) Hin conflates the question of guilt with the element of identity. Even if not the most probative evidence of identity, the gang

circumstances were properly offered as one component to prove that Hin committed the unadjudicated activities. We conclude there was no abuse of discretion in the trial court's decision to permit the testimony.

### B. Alleged Instructional Error (Aider and Abettor Liability)

On request by the prosecutor, the court instructed the jury at the penalty phase with the then-current version of CALJIC No. 3.00: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [1] Those who directly and actively commit or attempt to commit the act constituting the crime, or [2] Those who aid and abet the commission or attempted commission of the crime." Hin contends that CALJIC No. 3.00's mandate to find "[e]ach principal, regardless of the extent or manner of participation . . . *equally guilty*" (italics added) violated his right to due process and the Eighth Amendment's requirement of individualized consideration of the defendant's characteristics at the penalty phase of a capital trial because the instruction "effectively told the jury that it could consider codefendant Kak's conduct as a factor in aggravation." For a similar reason, he contends that the "equally guilty" instruction was improper as applied to aggravating evidence proffered under section 190.3, factor (b).

As an initial matter, the Attorney General argues that Hin has waived this argument because he did not object at trial. But Hin's claim that the instruction is not legally correct and therefore violates his right to due process of law "is not of the

type that must be preserved by objection." (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7; see § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*Ibid.*) Hin's contention that CALJIC No. 3.00 authorized the jury to consider Kak's conduct as a factor in aggravation is unsupported by the record.

After preliminary penalty phase instructions, the court instructed the jury regarding evidence introduced for the purpose of showing additional crimes as aggravated circumstances. The jury was then instructed on battery — a relevant crime that it had not been instructed on during the guilt phase — and with CALJIC Nos. 3.00 and 3.01. When read in context, it is clear that this instruction pertained to the section 190.3, factor (b) offenses rather than to Kak's conduct in the underlying murder. Thus, CALJIC No. 3.00 did not prevent the jury from making an individualized assessment of the appropriateness of the death penalty as to the capital crime.

Hin also contends that CALJIC No. 3.00 is erroneous as applied to the section 190.3, factor (b) evidence because the instruction's "equally guilty" provision is legally incorrect. Since the time of Hin's trial, "CALJIC No. 3.00 has been revised to

address the circumstance that aiders and abettors are not always guilty of *the same crime* as the actual perpetrators. [Citations.] Currently, if an aider and abettor might be guilty of a different crime than the actual perpetrator, the court should modify the instruction to state, 'Each principal, regardless of the extent or manner of participation is *guilty of a crime*.'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433, quoting CALJIC No. 3.00, italics added by *Bryant*.) This revision recognizes that although the instruction as given here "generally state[s] a correct rule of law" in the sense that "[a]ll principals, including aiders and abettors, are . . . criminally liable," the instruction as given "could be misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding." (*Ibid.*)

Hin argues that a reasonable juror could have determined that he acted with a less culpable state than the shooter on Comstock Drive, but that concern is addressed by the trial court's instruction with CALJIC 3.01: "A person aids and abets the commission or attempted commission of a crime when he or she: [¶] 1. With knowledge of the unlawful purpose of the perpetrator, and [¶] 2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] 3. By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." A juror

could not have found Hin to be an aider and abettor under CALJIC No. 3.01 unless it determined that Hin had knowledge of the perpetrator's intent, and "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*Samaniego, supra*, 172 Cal.App.4th at p. 1166, citing *People v. Hughes* (2002) 27 Cal.4th 287, 371.) Further, as the trial court instructed, unless a juror found Hin guilty beyond a reasonable doubt of aiding and abetting the shooting on Comstock Drive, that juror was directed not to consider that evidence.

Hin acknowledges that the jury was so instructed with CALJIC No. 3.01 but argues that the two instructions conflict and that "where a trial court gives conflicting instructions, a reviewing court may not assume that the jury applied the correct instruction." We do not see how CALJIC No. 3.00 conflicts with CALJIC No. 3.01. CALJIC No. 3.00 defines principals to include aiders and abettors, while CALJIC No. 3.01 defines the necessary intent for the aider and abettor. "Under the circumstances, there is no reasonable likelihood that the jury was confused or misled by the trial court's instruction that the aider and abettor and the direct perpetrator were 'equally guilty.'" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 44.)

## C. Victim Impact Testimony

### 1. Facts

Toward the end of the first day of victim impact testimony, Martinez's seven-year-old brother testified that Martinez was in heaven, described some of the activities they did together, and

testified that he missed playing with his older brother.  At the end of this brief testimony, the court clerk rather than the trial judge called for a recess until the following morning and admonished the jurors.

The following morning, defense counsel requested that the events of the previous day be made part of the record.  The court read the following into the record:  "I will say that during the testimony yesterday afternoon, when that little boy . . . testified and with tears streaming down his face, talking about never seeing his brother again and missing his brother because he wouldn't be able to play with him again, it did affect me and — however, I was on the verge of having a reaction.  In other words, I didn't have tears in my eyes, but I didn't want the jury to see me, so I turned so the jury would not see me.  But I will say I didn't trust myself to speak."  The court continued:  "Not even to say recess, and so that's why I wrote to my clerk to have — to have her recess the jury and I left because I didn't want the jury to see me, and — although I didn't have — in other words, while I wasn't crying, half the courtroom was crying, I could hear, but it was just one of those situations where, yes, that little boy affected me and I will say this, I have a weakness for small children in distress and it's the first time that's ever happened to me in court in almost 22 years, but my main concern was to hide my reaction from the jury.  [¶]  So far as I know, the jury didn't see anything.  Judges are human, too.  So I will put this in — make this part of the record."

Defense counsel moved for a mistrial, arguing the jury "couldn't help but see there was a reaction" and that it put Hin "in a position of potential prejudice."

The trial court denied the motion, explaining: "First of all, victim impact testimony, by its nature, is emotional. Obviously, there's a point where it becomes unfair to the defendant, but [the prosecutor] didn't ask any questions that were outside the norm, and I mean it's — it's just a natural human reaction to be affected by testimony like that." The court continued:

"As I say, I — I did turn. I was not crying. I didn't have tears in my eyes. I was just on the verge, and so that's why I turned because I was afraid if I didn't turn or if I would have looked at that little boy anymore or said anything that I could have had a visible emotional reaction.

"So the question is are we going to continue to have living breathing human beings as judges or we're going to replace the bench with robots, or should I have taken a recess and gone and had a shot of Valium or something to dope myself up to deaden all my human emotions?

"I don't think that's what the law requires. I think — I mean that's the problem with having human beings handling these cases, and yesterday it did happen, at the very end of the testimony, and actually, I think I turned just about the point where it was — where [the prosecutor] said no further questions.

"Yes, everything you say is true, describing what — what my — what I did, and I absolutely had a reaction, but I think — I think jurors are sophisticated enough to be able to make a decision based on the evidence and their interpretation of the evidence, and I'll reread the instruction that says nothing I have said or done should have an influence on the jury, and we'll leave it at that."

The second incident occurred the following day, when Martinez's father testified with the assistance of an interpreter. During this testimony, the interpreter requested "[o]ne minute," to which the court instructed that it would "[t]ake a short break . . . in place." Following the brief recess, the interpreter began to give a response on behalf of Martinez's father before stating, "I'm sorry, Your Honor. I have to take a break." The court then took its lunch recess.

After returning from the lunch recess, defense counsel requested to put the following on the record: "We had an incident, just so we're clear on the record, before we broke. It was about 20 after 11:00 when we broke. Ordinarily we break around noon. [¶] Again, it had to do with court personnel who were emotional and were unable to continue their professional job because of that. [¶] Now, I can almost sense what people are going to say. I think we have a certain obligation. I don't mind the family. They have every right. It's their personal loss, but when we have, not one incident but two incidents of court personnel showing emotion in front of the jury, I think that highly prejudices [Hin]. I think that it's something that should not occur, and I think . . . the only remedy is to start over, get a new jury, proceed to the penalty phase, not all the way back to the beginning, but we do need to have a jury that's not overly influenced by the emotional prejudice I see taking place."

The court again denied the motion, reiterating that victim impact testimony "by its nature [is] going to be emotional." The court also noted that the questions asked by the prosecutor "were very benign." The court then stated: "[O]nce again, we're dealing with human beings. It's a natural human reaction, and while court personnel have a certain desensitizing to this sort of

123

testimony, just by having been in the courtrooms for years and years, . . . we're still human and it is only human to show a certain amount of emotion on occasion. [¶] But I am confident that in spite of what has happened, the jury is going to be able to make a decision based on the evidence and their view of the evidence and the emotion will therefore be none."

At the request of the prosecutor, the court described the events leading up to the motion: "[T]he interpreter asked for a moment," and the court granted the request, saying "let's have a little recess in place, and we waited a minute or so. She began writing something down, and at that point I had no idea what she needed a recess for. I thought it was perhaps confusion over translation of a term, but then when we resumed, then I could see that she was becoming emotional and was beginning to cry. [¶] I would describe it as quiet crying, and I think she said something — I forget what she said, but I assume the reporter picked it up and then we recessed until 1:30. So that's about it." The prosecutor added that he did not see any tears, and the court agreed, adding, "It was just crying in the sense of she appeared to be crying. Whether there were tears or not, I don't know." The court and the prosecutor both agreed that the interpreter "was not sobbing" and that she was facing away from the jury.

At the close of the penalty phase, defense counsel requested that the trial court modify CALJIC No. 8.84.1 to include language regarding the reaction of court personnel to the evidence presented. The court agreed, instructing the jury: "You must neither be influenced by bias nor prejudice against the defendant nor swayed by public opinion or public feelings or

reactions to the evidence, if any, by court personnel or audience members."

The court also agreed to give CALJIC No. 17.30 as follows: "I have not intended by anything I have said or done or by any question that I may have said or by any ruling that I may have made to intimate or suggest what you should find to be the facts or that I believe or disbelieve any witness. If anything I have done or said seemed to so indicate, you will disregard it and form your own conclusions."

After the jury returned its verdict, Hin moved for a new trial as to both the guilt and penalty phase. As relevant to this issue, Hin argued that "[t]he show of emotion by the Judge constituted a comment on the evidence that was being presented at the time, and inadvertently, aided the juror's [*sic*] decision that this crime was 'horrendous' enough to deserve imposition of the death penalty as it was horrendous enough to so move the judge as to prevent him from discharging the jury for the day and to so move the interpreter as to cause her to burst out crying." The motion also argued that "[t]he effect was borne out by the declaration of [Juror No. 7] when she told of being asked how could she not vote for death when the case was so horrendous that even the judge was affected."

The court brought in several jurors to testify regarding events that occurred during deliberations. Although the hearing focused exclusively on alleged misconduct during the penalty phase (an issue addressed below), the court found that Juror No. 7 was not credible and that nothing alleged in her affidavit took place. It is not clear from the record whether that comment was directed at her statement regarding the court's reaction to the victim impact testimony or not. The court denied

the motion for a new trial based on the alleged violation of its duty of impartiality, observing that its reasoning "would be the same" as at the time it denied the motion for mistrial.

### 2. *Analysis*

Hin argues that the trial court abused its discretion in denying his two motions for a mistrial and in denying his motion for a new trial based on the facts above regarding victim impact testimony.

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198.) We conclude that neither incident during the presentation of victim impact testimony was " 'so incurably prejudicial that a new trial was required.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 634.)

As an initial matter, the record does not establish that the jury actually saw or heard any emotional response from the trial judge or the interpreter. Rather, the court sought to prevent any emotional displays, turning away from the jury, and asking the clerk to call the recess and admonish the jury. It was proper for the trial judge to take such care, as "[j]urors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233; see also *Bollenbach v. United States*

(1946) 326 U.S. 607, 612 [" 'The influence of the trial judge on the jury is necessarily and properly of great weight.' "].)

Similarly, the trial court called an early recess when it became apparent that the interpreter was having an emotional response to the witness's testimony. Again, the record does not indicate that any juror was aware of the issue. On this record, the trial court appears to have acted within its discretion when it determined that any prejudice resulting from these two incidents could be cured through proper jury instruction after the mitigating steps the court had taken.

As with the court's denial of Hin's motions for mistrial, we review the denial of a new trial motion for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) In moving for a new trial, Hin reiterated the arguments discussed above and asserted that the court had violated its duty of impartiality and that the emotional responses of court personnel were incurably prejudicial. Though this aspect of Hin's motion was not framed as one predicated on juror misconduct, we will, as in that context, "accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence" but will exercise our "independent judgment to determine whether" those findings and determinations give rise to prejudice such that the trial court abused its discretion in denying the motion. (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).)

Here, the trial court's finding that the juror's declaration was not credible is supported by substantial evidence. Following the conclusion of Juror No. 7's testimony, the prosecutor described her demeanor as "completely different" from other jurors who testified with respect to Hin's jury

misconduct claim. The prosecutor recounted that Juror No. 7 "squirmed quite often while she was giving her answers" and that "[s]he appeared to be extremely nervous, wringing her hands at times." The trial court described Juror No. 7 as "not nearly as believable a witness" as the other jurors. The court made "a finding that [it did] not find [Juror No. 7] to be credible and [it did] not find that any of that alleged in her affidavit took place."

Having reached this conclusion, the court was left essentially with the same evidence it had when it denied Hin's motions for mistrial. Having previously found no abuse of discretion in the trial court's denial of those motions, we similarly find no abuse of discretion in its denial of Hin's new trial motion on this issue.

## D. Jury Misconduct

### 1. Facts

On January 9, 2006, three days after the jury returned its verdict in this case, Juror No. 7 hand delivered a letter to the court in which she alleged that Juror No. 6 had told her that he and Juror No. 10 "had talked about the case as they were driving to or from court together" and that Juror No. 10 "had helped [Juror No. 6] to understand why he should change his vote."

Defense counsel interviewed Juror No. 7 on January 25, 2006, and obtained a signed declaration elaborating those claims. Juror No. 7 declared that during guilt phase deliberations, Juror No. 10 "informed the jury that he had heard that the jury in [Kak's] case had convicted [Kak], and that they determined Kak was not the shooter. He then said that the Kak jury must have heard some evidence we didn't hear that proved that [Hin] was the shooter." Juror No. 10 also "brought up the

fact that giving [Hin] life without the possibility of parole would be giving him nothing, because that is what he was going to get anyway." Juror No. 10 further stated to the jury "that he knew someone who had been convicted of murder who got out in about seven years and didn't think it was any big thing" and that "Hin would just adapt to prison and have a good time playing ball with his friends." After reaching the penalty phase verdict, Juror No. 7 recounted, Juror No. 6, "who was the next to the last holdout on the penalty phase with me, came up to me and told me that [Juror No. 10] convinced [Juror No. 6] to change his verdict in the car while they commuted to together." Finally, Juror No. 7 declared that "during the penalty phase deliberations, I was asked how could I not vote for death when the case was so horrendous that even the Judge was affected by it during [Martinez's] little brother's testimony."

Based on Juror No. 7's letter and declaration, Hin requested contact information for all jurors who deliberated to investigate juror misconduct, citing Code of Civil Procedure sections 206 and 237 and Hin's rights to due process and to trial by jury under the state and federal Constitutions. Hin also requested an evidentiary hearing to "examin[e] the existence of, and extent of, jury misconduct in the deliberation process" and whether he had been deprived of his state and federal rights to a fair trial based only on evidence admitted at trial. Hin separately moved for new guilt and penalty trials on the grounds that the jury had received "evidence out of court" or committed misconduct preventing "a fair and due consideration of the case" (§ 1181, subds. 2 & 3) and that juror misconduct violated his state and federal constitutional rights to a fair trial and an impartial jury (Cal. Const., art. I, §§ 15, 16; U.S. Const., 6th & 14th Amends.).

Addressing Hin's motion to obtain information about the jurors, the court noted that Juror No. 7's declaration provided sufficient evidence to hold an evidentiary hearing, to which defense counsel stated that he would like to bring in Juror Nos. 6, 10, and 12, later adding Juror No. 4 to his request. Explaining that Juror No. 4 was not mentioned in the declaration from Juror No. 7, the trial court proposed either to hold a hearing on whether defense counsel was entitled to contact information for the jurors, or to subpoena Juror Nos. 6, 10 and 12 to an evidentiary hearing and defense counsel could "question them at that time." Defense counsel agreed to the second option as "the most expeditious way to do it."

The prosecutor's opposition to the motion for a new trial included a declaration from Juror No. 10, stating that he "never read any newspaper accounts regarding this case, or the co-defendant"; that he "never said in deliberations that 'the Kak jury must have heard some evidence that we didn't hear that proved [Hin] was the shooter' "; and that he and Juror No. 6 "never discussed the case while commuting to Court, and never discussed the case outside the jury deliberations room."

The hearing was held on February 16, 2006. Juror No. 10 denied that he had ever read anything in the newspaper about this case or discussed anything that may have been in a newspaper during deliberations. Juror No. 10 further denied having heard from any source during guilt phase deliberations that Kak had been convicted. He testified that Kak's conviction was never discussed in the jury room, nor was there any discussion regarding evidence that the Kak jury might have received showing that Hin was the shooter. Juror No. 10 acknowledged that he had commuted with Juror No. 6, whom he

130

knew from work, but he denied that they had discussed anything about the case outside of the courtroom.

Juror No. 6 acknowledged that he and Juror No. 10 began commuting into court together around the third or fourth week of trial, but testified that they only discussed deliberations in the deliberation room. Juror No. 6 specifically denied having any conversation with Juror No. 7 regarding why he changed his vote. He also denied that he had heard anything about Kak's verdict during the deliberations.

Juror No. 12, the foreperson, could not recall Juror No. 10 saying anything about the Kak verdict at either the guilt or penalty phase of the trial. Juror No. 12 also testified that he never received any information regarding Kak's conviction or that Kak was found not to be the shooter at American Legion Park.

Finally, Juror No. 7 testified. She continued to allege that Juror No. 10 had talked about Kak's case during the guilt phase deliberations, saying that Juror No. 10 "had heard that the Kak jury had found that Kak was not the shooter," and that this fact "caused him to speculate that the Kak jury must have had some evidence that [Hin's jury] didn't have." Juror No. 7 testified that Juror No. 10 had not mentioned where he heard the information about Kak's verdict. Juror No. 7 further testified that Juror Nos. 1, 8, and 9 were near her at the time that Juror No. 10 made his comments about Kak. While Juror No. 10 was making these statements, she testified, Juror No. 8 "commented about [an] obscene gesture that was made" by Kak following the verdict, a detail reported in the newspaper article that ran on the first day of the Hin jury's guilt phase deliberations. Juror No. 7 believed that it may have been Juror No. 1 who

commented that the jury was not supposed to consider the information about Kak's verdict, though she could not be certain. Juror No. 7 testified that Juror No. 6 approached her following the penalty verdict and said that he and Juror No. 10 and been talking during the commute and that Juror No. 10 had helped Juror No. 6 "understand why he should vote for the death penalty."

Juror No. 7 acknowledged that she had not mentioned the allegations of what happened at the guilt phase in her letter to the court; the first time she mentioned it was when she met with the defense investigator. She claimed that she had not brought it up earlier because the jurors were "not supposed to know" that information or consider it, and she "didn't want to get anybody in trouble."

Following the testimony of the jurors, defense counsel argued that Juror No. 7's testimony was corroborated by the fact that Hin's jury asked for a video of Kak's statement on the first day of deliberations, after the Kak verdict was rendered. Defense counsel also argued that it was understandable that Juror No. 7 did not come forward with the information earlier because "she didn't want to get anybody in trouble."

The prosecutor argued that Juror Nos. 6 and 12 corroborated Juror No. 10's testimony that the things alleged by Juror No. 7 did not happen. The prosecutor questioned Juror No. 7's credibility, arguing that Juror Nos. 6, 10, and 12 "testified clearly, answered the questions directly," and did not "appear to be nervous during the time they testified," while Juror No. 7 "appeared to be extremely nervous" and "[h]ad difficulty speaking." The prosecutor also noted that the Kak interview had been "brought out on cross-examination," along

with testimony that Kak "admitted to in fact firing the gun," "[s]o these [were] not new issues for a trial anyway."

The court noted that the jury knew there was a trial going on with Kak and that it was "just natural curiosity" that the jury would want to know what Kak said in his case. The court also noted that "there was absolutely no evidence that [Hin] used a gun" and that this "was not argued." On that basis, the court observed, even if the allegations regarding the Kak verdict were true, it would not require a new trial "because it's just based on conjecture."

The court agreed with the prosecutor that Juror No. 10 was "very believable" and "very straight forward" when he denied reading about the case or discussing anything about the deliberations with Juror No. 6, and that his testimony was corroborated by Juror No. 6 and Juror No. 12, the foreperson. In contrast, the court found that Juror No. 7 "was not nearly as believable" as the other witnesses, as she appeared "uneasy," "nervous and hesitant in her responses." The court also noted that Juror No. 7 did not mention anything about Kak in her letter to the court. Based on these findings, the court found that there had been no juror misconduct and denied the motion for a new trial on those grounds.

### 2. Analysis

Hin asserts seven arguments related to his motion for a new trial on the basis of juror misconduct. First, he contends that the jury's request for Kak's video was itself evidence of misconduct, suggesting that the request violated the jury's oath to render a true verdict " 'according only to the evidence presented to you and to the instructions of the court.' " (Code Civ. Proc., § 232, subd. (b).) As the trial court reasonably

133

concluded, there is no evidence the jury considered the existence of a video or any other source outside of the trial in reaching its verdicts. In response to the request, the trial court admonished the jury as follows: "There is no evidence that there is a video, and if there was a video, it isn't evidence in this case. [¶] The only things that we can give the jury are . . . exhibits actually introduced in evidence. So there is no evidence of any video by [Kak]. [¶] I'm also going to instruct the jury not to speculate as to whether there is a video or is not. And also not speculate if there is a video, what statements it might contain, because that has not been received in evidence." We presume the jury followed this instruction.

Second, Hin argues the request for Kak's video was evidence that one or more jurors read or heard information about Kak's verdict. In particular, Hin points to a newspaper article reporting that Kak had been convicted and found not to be the shooter and suggests that the request for the video was evidence that Hin's jury had read the newspaper story. This was corroborated, in Hin's view, by Juror No. 7's testimony about statements by fellow jurors during the guilt phase deliberations. But the trial court did not find Juror No. 7 to be credible, and there was no mention of a video in the newspaper story that Hin says the jury improperly accessed. Moreover, as the trial court observed, curiosity about what Hin's codefendant may have said was natural, and there is no evidence the jury disregarded the trial court's instruction that no video was in evidence and that it should not speculate about the existence of such a video.

Hin relies on *People v. Andrews* (1983) 149 Cal.App.3d 358, which held that the trial court abused its discretion by

failing to grant a new trial after discovering during deliberations that "jurors read a newspaper article indicating that appellant's wife had entered a plea of guilty to charges stemming from the same incidents for which appellant was on trial and that appellant had other felony charges pending in Los Angeles." (*Id.* at p. 361.) The trial court in *Andrews* first became aware of this when the deliberating jury asked, " 'What is the pending charge against Andrews in Los Angeles that was referred to by Mr. Watson (a detective assigned to the case)?' " (*Id.* at p. 363.) But in *Andrews*, unlike here, the article at issue was actually sent to the jury room along with other exhibits not in evidence in that case. (*Id.* at p. 362.) The Court of Appeal found this sufficient to establish juror misconduct, triggering the prosecutor's burden to rebut the "presumption by proof that no prejudice actually resulted." (*Id.* at p. 363.) The trial court here found no credible evidence that the news coverage of Kak's verdict ever entered the deliberation room.

Third, Hin argues the trial court erred when it observed that there was no evidence or argument that Hin was the shooter and thus no reason for Hin's jury to look for evidence that Hin rather than Kak was the shooter. The prosecutor said in closing that "Pizano does not know who fired the gun," adding: "You can in fact [find] — I believe he in fact took the gun, he . . . in fact fired it after making the cryptic remark of, 'Don't know [*sic*] it's dangerous to be in park,' or you can find [Kak] did it. He's liable for murder either way. That's because of the felony murder rule. The liability is aiding and abetting and aiding and abetting with natural and probable consequences." The prosecutor later offered a similar argument: "If some of you believe that [Hin] was the actual killer, that's fine, to get to murder. [¶] If some of you believe he was, in fact, the aider and

135

abettor to a murder . . . that's fine, also."  Read in context, it is clear that the prosecutor was defining implied malice murder, arguing correctly that it did not matter who was the shooter under the theories of the felony-murder rule and aiding and abetting with natural and probable consequences.  As the prosecutor argued, "Kak was a principal in the robbery and in the murder and, in fact discharged a firearm," adding that the evidence "did not prove [Hin] personally discharged the firearm."

Fourth, Hin argues the trial court erred by excluding evidence in support of his motion for a new trial that other jurors made comments showing that they heard Juror No. 10 talk about the Kak verdict.  He focuses on Juror No. 7's explanation of why she did not bring up her concerns during the guilt phase: "We all said we are not supposed to know that.  We can't consider that.  You know, I didn't want to get anybody in trouble.  There were . . . other people who must have heard something because they were making comments."  Hin argues that the court interjected at that point, explaining "We can't have . . . what you are guessing, just what you actually heard," to which Juror No. 7 offered no further answer.  But the record shows that this statement was made by the prosecutor, not the court.  In any event, the caution to Juror No. 7 that she should limit her testimony to what she actually heard was proper and did not preclude the witness from continuing her answer or prevent defense counsel from returning to this point.  Hin contends the juror was not " 'guessing' " but rather was about to relate what she " 'heard' " other jurors say in response to receiving information about the Kak verdict.  But both parties continued to question the juror, and neither returned to this point even though nothing precluded them from doing so.

Fifth, Hin argues the trial court improperly excluded as speculation evidence that Juror No. 1 was upset by hearing comments about the Kak verdict. Defense counsel asked Juror No. 7 who was at her end of the table in the jury room when Juror No. 10 talked about the Kak verdict. Juror No. 7 answered that Juror No. 1 was seated next to her, adding, "I think she was — she was upset by it." The trial court sustained the prosecutor's objection that this was "speculation" and granted a motion to strike the testimony. Juror No. 7 later testified without objection that Juror No. 1 said that "if anybody hears anything about the Kak verdict, she didn't want to know about it. So . . . that's why she made some comments that made me think that she was upset about it."

" 'Generally, a lay witness may not give an opinion about another's state of mind,' but 'a witness may testify about objective behavior and describe behavior as being consistent with a state of mind.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 808.) Thus, a witness may provide opinion testimony about what another person appeared to be "thinking and intending" based on observing the "objective behavior" of someone who "verbalized her own state of mind." (*Ibid.*) The distinction articulated in *Blacksher* delineates the improper testimony of Juror No. 7's opinion regarding Juror No. 1's state of mind from the permissible testimony she later gave that described statements made by Juror No. 1 as evidence of her state of mind. We find no error.

Sixth, Hin argues the trial court erred by excluding as irrelevant evidence that Juror No. 10 discussed another case where a defendant was convicted of murder but got out of prison in seven years. In her declaration, Juror No. 7 stated that

137

during penalty deliberations Juror No. 10 "mentioned that he knew someone who had been convicted of murder who got out in about seven years and didn't think it was any big thing." Defense counsel asked Juror No. 10 whether he said this. The court sustained the prosecutor's objection that this was "[i]rrelevant." Defense counsel then moved on to questions regarding discussions in the jury room.

"Jurors are not allowed to obtain information from outside sources either as to factual matters or for guidance on the law." (*People v. Karis* (1988) 46 Cal.3d 612, 642.) The alleged statement by Juror No. 10 regarding a different murder case was not in evidence in this matter, so it could not properly be considered by the jury. Even assuming Juror No. 10 made such a comment (notwithstanding the trial court's findings regarding Juror No. 7's lack of credibility), there is no indication the jury relied on such a comment during penalty phase deliberations.

Seventh and last, Hin argues the trial court's findings that Juror No. 7 was not credible and that no misconduct occurred should be rejected because the court "restricted the evidence primarily to witnesses supporting the prosecution's position." The trial court has discretion to grant an evidentiary hearing to resolve material disputed issues of fact. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) When a trial court is aware of possible juror misconduct, the court "must 'make whatever inquiry is reasonably necessary' " to resolve the matter. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 417.) Here, the trial court reasonably restricted the testimony at the hearing to those jurors named in Juror No. 7's declaration, plus the foreperson. Having found Juror No. 7 not credible, the trial court reasonably declined to receive further testimony on the issue.

Finally, Hin argues, "When the trial court's errors are set aside, the record provides substantial evidence of juror misconduct during guilt and penalty deliberations about the American Legion Park incident." Having found no error, we reject this argument. In the alternative, Hin contends that state and federal law require a new evidentiary hearing to hear from additional jurors. We hold that the trial court's decisions on this point were reasonable and find no basis to remand for further proceedings.

### E. California Jury Trial Right

Hin contends that the penalty verdict here is invalid under state constitutional and statutory law because the penalty phase jury instructions given in this case (CALJIC Nos. 8.84–8.88) failed to impose requirements of unanimity and proof beyond a reasonable doubt for a death verdict. These legal errors, he argues, are contrary to the "inviolate" state constitutional right to trial by jury (Cal. Const., art. I, § 16) and the provisions of the Evidence Code and Penal Code governing the burden of proof and determination of issues of fact in a criminal action, including penalty proceedings. Citing both the state Constitution and various provisions of the Evidence and Penal Codes, Hin argues the trial court should have instructed the jury (1) that it must unanimously agree on which aggravating factors are established by the evidence; (2) that it must make these findings beyond a reasonable doubt; and (3) before imposing a sentence of death, the jury must unanimously agree that the aggravating factors outweigh the mitigating factors and that finding must also be beyond a reasonable doubt.

We recently held that "neither article I, section 16 of the

California Constitution nor Penal Code section 1042 provides a basis to require unanimity in the jury's determination of factually disputed aggravating circumstances." (*People v. McDaniel* (2021) 12 Cal.5th 97, 147–148.) Moreover, "we are unable to infer from the jury trial guarantee in article I, section 16 of the California Constitution or Penal Code section 1042 a requirement of certainty beyond a reasonable doubt for the ultimate penalty verdict." (*Id.* at p. 155.) For the reasons set forth in *McDaniel*, we reject Hin's claims to the extent they rest on article I, section 16 of the California Constitution and Penal Code section 1042.

Hin goes beyond the claims presented in *McDaniel* to argue that provisions of the Evidence Code and the Penal Code (other than section 1042) require the court to instruct the jury that proof beyond a reasonable doubt applies at the penalty phase. Specifically, Hin argues that Penal Code sections 682 and 190.1, subdivision (c) discuss punishment as a criminal proceeding, and that Evidence Code sections 500, 502, and 520 therefore require the trial court to instruct the jury regarding reasonable doubt at the penalty phase. We recently rejected similar arguments in *People v. Potts* (2019) 6 Cal.5th 1012, 1058–1060, and Hin provides no persuasive basis to reconsider that decision.

### F. Additional Constitutional Challenges to the Death Penalty

Hin contends California's death penalty statute and implementing instructions are constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, as explained below, and Hin provides no persuasive reason to revisit our decisions.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*Dykes, supra,* 46 Cal.4th at p. 813.) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978–979.)

The language "so substantial" in CALJIC No. 8.88 is not impermissibly vague. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 56.) "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*People v. Dement* (2011) 53 Cal.4th 1, 57 (*Dement*), overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 (*Rangel*).)

" ' "[T]he statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." ' " (*People v. Parson* (2008) 44 Cal.4th 332, 369.) And the trial court was not required to "instruct that the jury can consider certain statutory factors only in mitigation." (*People v. Valencia* (2008) 43 Cal.4th 268, 311.)

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors

outweighed the mitigating factors, or that death is the appropriate sentence." (*Rangel*, *supra*, 62 Cal.4th at p. 1235.) We have previously held that nothing in *Hurst v. Florida* (2016) 577 U.S. 92, *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466 affects our conclusions in this regard. (*Rangel*, at p. 1235 & fn. 16.)

"No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof." (*Dement, supra*, 53 Cal.4th at p. 55.) The trial court is not required to instruct the jury that "if it determines the mitigating factors outweigh the aggravating factors, it is required to return a sentence of life imprisonment without the possibility of parole." (*Id.* at p. 56.)

"Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.)

"The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.) " 'The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 373.)

## G. Cumulative Prejudice

Hin contends the cumulative effect of guilt and penalty phase errors requires us to reverse the judgement. At the guilt phase, we concluded that the six counts of attempted murder

must be reversed because the jury was permitted to rely on a now-abrogated theory predicated on the natural and probable consequences doctrine. We also found insufficient evidence to support the gang allegations underlying the enhancements on each count of attempted murder, the single count of active gang participation, and the gang-murder special circumstance under the statute as amended by Assembly Bill 333. We further found that the trial court's admission of the rap song "Bang Bang" was an abuse of discretion at both the guilt and penalty phases, but that this error was harmless. At the penalty phase, we assumed error in the trial court's admission of evidence regarding the Comstock Drive shooting, but we found the error to be harmless.

Although we will not reverse a judgment "absent a clear showing of a miscarriage of justice," "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.) Because we do not find that it is "reasonably probable that in the absence of the cumulative effect of these errors the jury would have reached a result more favorable" to Hin, we do not find that the combination of the errors and assumed errors here require reversal of Hin's murder conviction or sentence. (*People v. Holt* (1984) 37 Cal.3d 436, 459.)

## H. Sentencing Enhancements

Counts 5 through 9 each alleged one count of attempted murder for the shooting at Bedlow Drive, with corresponding allegations that the attempted murders had been gang related and that a principal had caused great bodily injury by personally and intentionally discharging a firearm. The jury found Hin guilty of each of the five counts of attempted murder and

returned a true findings on each of the enhancements. Based on these findings, the court imposed additional and consecutive terms of 25 years to life in prison on each of Hin's five counts of attempted murders based on the firearm enhancements and set a 15-year minimum parole ineligibility on the same five counts based on the gang enhancements. Hin claims that a subsequent change in the law requires this court to remand for the trial court to consider whether to strike the 25-year firearm enhancement on these counts. In the alternative, Hin argues the trial court erred in imposing the 15-year minimum parole ineligibility in addition to the 25-year sentencing enhancement. In light of our holding that each of these counts must be reversed on other grounds, we do not address this claim.

## CONCLUSION

For the reasons above, we reverse Hin's convictions on six counts of attempted murder (counts 3 and 5 through 9) and being an active participant in a criminal street gang (count 15). We further vacate the true finding on the gang-murder special circumstance. We remand to the trial court for any retrial and direct the trial court to strike the gang-murder special-circumstance true finding. Retrial is permissible as to counts 3, 6, 7, and 9 (and the related gang enhancements) and count 15. We hold that the evidence was insufficient to sustain counts 5 and 8, but do not reach whether retrial would be permitted on these counts. Principles of double jeopardy preclude retrial as to the gang-murder special circumstance. We affirm the judgment in all other respects.

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Hin

———————————————————————————————

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

———————————————————————————————

**Opinion No.** S141519
**Date Filed:**  February 3, 2025

———————————————————————————————

**Court:**  Superior
**County:**  San Joaquin
**Judge:**  Bernard J. Garber

———————————————————————————————

**Counsel:**

Donald R. Tickle, under appointment by the Supreme Court, for Defendant and Appellant.

Galit Lipa, State Public Defender, and AJ Kutchins, Deputy State Public Defender, for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Dane R. Gillette, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell and James William Bilderback II, Assistant Attorneys General, Sean M. McCoy, Ryan B. McCarroll, Kimberly A. Donohue, Eric L. Christoffersen, Kenneth N. Sokoler, Ross K. Naughton and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Donald R. Tickle
Attorney at Law
909 New Jersey Avenue SE, No. 1302
Washington, DC 20003
(202) 695-9405

Jeffrey A. White
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244
(916) 210-7682